# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

## Ft. Myers Division

| | | |
|---|---|---|
| SIERRA CLUB and ENVIRONMENTAL CONFEDERATION OF SOUTHWEST FLORIDA, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:20-cv-00013-SPC-NPM |
| v. | ) ) ) | |
| U.S. FISH AND WILDLIFE SERVICE; AURELIA SKIPWORTH, as Director of the U.S. Fish and Wildlife Service; FLORIDA DEPARTMENT OF TRANSPORTATION; KEVIN J. THIBAULT, as Secretary of the Florida Department of Transportation; And U.S. ARMY CORPS OF ENGINEERS; and TODD T. SEMONITE, as Chief Engineer and Commanding General of the U.S. Army Corps of Engineers, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

This action arises out of decisions by the U.S. Fish and Wildlife Service (USFWS), the Florida Department of Transportation (FDOT), and the U.S. Army Corps of Engineers (Corps) that threaten the continued existence and recovery of the critically endangered Florida Panther. Plaintiffs Sierra Club and Environmental Confederation of Southwest Florida (ECOSWF) bring this suit to enforce federal environmental law, namely the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq.

**INTRODUCTION**

1.      The iconic Florida Panther is the official state animal and one of the most endangered species in the world.  This magnificent species once enjoyed a range that extended deep into the United States, as far west as Arkansas and as far north as Tennessee.  It was among the first species to be designated as endangered under federal law.

2.      In 1973, the U.S. Congress passed the ESA, a statute the Supreme Court of the United States has described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 180 (1978).  According to the Court, "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."  <u>Id.</u> at 184.

3.      Today, there are fewer than 200 adult Florida Panthers in existence, with some estimates as low as 120.  The only existing breeding population resides in southern Florida.  A primary threat to the species' continued existence are collisions caused by increased motor vehicle traffic in prime panther habitat.  In other words, the Florida Panther is on the road to extinction.

4.      It is in this context that FDOT plans to dramatically expand the size of Florida State Roads (SR) 29 and 82, doubling both from two to four lanes and eventually tripling SR 82 in parts.  The segments of road designated for these expansions are located in prime panther habitat.

5.      The USFWS has issued biological opinions for each project concluding that the road widening, taken individually, would have adverse impacts on the Florida Panther, but was not likely to jeopardize the panther's continued existence.  The biological opinions are arbitrary and capricious, an abuse of discretion, and not in accordance with the law.  They fail to meaningfully assess the harms to the Florida Panther, analyze the impacts of inevitable future development, and establish a threshold for panther road fatalities that would reinitiate consultation by the agencies to re-assess the impacts of the projects.

6.      Pursuant to NEPA, an agency may authorize an activity only if it has fully analyzed the activity's direct, indirect, and cumulative environmental impacts and based its authorization on reliable information and accurate scientific analysis.

7.      The Corps adopted USFWS' inadequate biological opinion for SR 82 in an Environmental Assessment prepared under NEPA in order to issue a Clean Water Act dredge and fill permit required for the road widening (Permit No. SAJ-2017-01376).

8.      FDOT invoked a categorical exclusion to the applicability of NEPA for SR 29, opining that the proposed road expansion will have no significant effects on the environment despite the recognized adverse impacts to the panther and the project's capacity increasing objectives.

9.      Plaintiffs challenge these agency actions as unlawful under the ESA, NEPA, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06.  They seek declaratory and injunctive relief to prevent the extinction of the Florida Panther.

3

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over the claims for relief in this action pursuant to 5 U.S.C. §§ 701–06 (actions under the APA); 16 U.S.C. § 1540 (actions arising under the ESA); 28 U.S.C. § 1331 (actions arising under the laws of the United States); 28 U.S.C. § 1361(actions to compel an officer of the United States to perform his or her duty); and 28 U.S.C. §§ 2201–02 (power to issue declaratory judgments and injunctive relief).

11.     Plaintiffs provided the Corps with written notice of the ESA violation more than 60 days prior to bringing the claim in this Amended Complaint, in compliance with 16 U.S.C. § 1540(g)(2)(A).

12.     Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and Plaintiff ECOSWF resides here.

## PARTIES

**Plaintiffs**

13.     Plaintiff Sierra Club, Inc. (Sierra Club), is a national non-profit grassroots environmental organization committed to the preservation and protection of endangered species, diverse natural ecosystems, and native biodiversity.  The Sierra Club has more than 775,000 members across the nation, including over 37,000 in Florida.  The Sierra Club's members and staff have researched, studied, observed, and sought protection for federally listed threatened and endangered species that inhabit southwest Florida,

including the Florida Panther.  These activities support Sierra Club's mission to explore,

enjoy, and protect the wild places of the earth.  Sierra Club brings this action on behalf of

itself and its adversely affected members.

14.     Plaintiff Environmental Confederation of Southwest Florida (ECOSWF) is

a Florida non-profit conservation organization based in Englewood, Florida, with

approximately 18 members consisting of organizations and individuals living in

Southwest Florida.  ECOSWF's mission is to protect the environment and natural

resources of Southwest Florida, including in Collier, Lee, and Hendry Counties.

ECOSWF accomplishes its goals through active stewardship of Southwest Florida's

wildlife, water, soil and air, through citizen participation and education, through legal

challenges aimed at preserving Florida's wildlife, and by its support of preservation and

conservation.  ECOSWF's members have researched, studied, observed, and sought

protection for federally-listed threatened and endangered species that inhabit southwest

Florida, including the Florida Panther.  These activities support ECOSWF's mission to

protect wildlife and their native habitat.  ECOSWF brings this action on behalf of itself

and its adversely affected members.

15.     Plaintiffs' members use wildlife areas within the Florida Panther's habitat

for recreational, aesthetic, scientific, and educational purposes.  Plaintiffs' members have

visited, observed, or sought to observe the Florida Panther within its habitat and intend to

continue to do so in the near future.  Plaintiffs' members derive recreational,

conservation, scientific, and aesthetic benefits from these rare species' existence in the

wild through observation, study, photography, and recreational activities within the Florida Panther's habitat.

16.     The above-described aesthetic, conversation, recreational, and scientific interests of Plaintiffs and their respective members have been, are being, and—unless the relief prayed for herein is granted—will continue to be adversely affected and irreparably injured by the Defendant Agencies' failure to comply with NEPA and the ESA as described below.  Plaintiffs have no adequate remedy at law.

**Defendants**

17.     Defendant U.S. Fish and Wildlife Service (USFWS) is an agency within the U.S. Department of the Interior and has the delegated responsibilities of administering and implementing the ESA.  USFWS issued the biological opinions for SR 29 and SR 82 challenged here.

18.     Defendant Aurelia Skipworth is the Director of USFWS and highest-ranking official responsible for actions taken by USFWS, including compliance with and implementation of the ESA.  Defendant Skipworth is sued in her official capacity only.  Defendant Skipworth and Defendant USFWS will collectively be referred to as USFWS.

19.     Defendant Florida Department of Transportation (FDOT) is an agency created under Florida law responsible for the planning and development of the state's public transportation system.  Pursuant to a Memorandum of Understanding between the FDOT and the Federal Highway Administration dated December 14, 2016, FDOT has assumed the U.S. Department of Transportation's responsibilities under NEPA to conduct environmental review and consultation for certain highway projects within the state,

including the projects at issue in this case.  FDOT issued the Categorical Exclusion for SR 29 challenged here.

20.     Defendant Kevin J. Thibault is the Secretary of FDOT and highest-ranking official responsible for actions taken by FDOT, including compliance with NEPA. Defendant Thibault is sued in his official capacity only.  Defendant Thibault and Defendant FDOT will collectively be referred to as FDOT.

21.     Defendant U.S. Army Corps of Engineers (Corps) is a federal agency organized under the U.S. Department of Defense.  The Corps is charged with administering permits under § 404 of the CWA for the discharge of dredged or fill material into the waters of the United States and ensuring that the requirements of NEPA and the ESA are fulfilled in connection with all evaluation and decision-making concerning such permits.  The Corps' regulatory district office in Jacksonville, Florida, oversees the regulatory program in Florida.  The Corps issued the Environmental Assessment for SR 82 challenged here.

22.     Defendant Todd T. Semonite is Chief of Engineers and Commanding General of the Corps and is designated to act for the Secretary of the Army.  Defendant Semonite oversees and is responsible for the actions of the Corps and its district offices, including compliance with NEPA and the ESA.  Defendant Semonite is sued in his official capacity only.  Defendant Semonite and Defendant Corps will collectively be referred to as the Corps.

**FACTUAL BACKGROUND**

23.     The Florida Panther is Florida's official state animal and one of the most endangered species in the world.  Florida Panthers are now extinct throughout 95% of their original range, which extended across Arkansas, Mississippi, Louisiana, Alabama, Georgia, Florida, Tennessee, and South Carolina.

24.     Today, the only breeding population is located in southern Florida.  There are fewer than 200 adult Florida Panthers still in existence.

25.     Panthers require large areas of contiguous habitat for social, breeding, and hunting behaviors.  To these ends, they can make use of a variety of habitat types, including cypress forests, thicket swamps, freshwater marshes, pine flatwoods, hardwood hammocks, saw palmetto woodlands, and even agricultural lands.

26.     Habitat destruction and fragmentation, often caused by increased development, present the greatest threat to panther survival.  Motor vehicle collisions are the leading cause of panther fatalities.

27.     From 2016 to 2018, motor vehicles were responsible for over 80% of recorded panther deaths (84 out of 102), and motor vehicles proved to be just as deadly in 2019, with vehicle collisions still the cause for over 80% of recorded panther deaths (16 of 19).  Only four days into 2020, a vehicle had already struck and killed a panther.

28.     FDOT recently approved plans to expand 18 miles of SR 29 and 3.2 miles of SR 82, which cross prime panther habitat in Collier, Lee, and Hendry Counties, placing the Florida Panther at even higher risk of extinction.  Most of the panthers' identified habitat and currently reproducing populations are in these same three counties.

29.     SR 29 runs north/south between Palmdale and Carnestown, Florida.  This includes a segment of SR 29 that runs between SR 82 and County Road 80A known as "Cowboy Way."  The proposed expansion would double the size of SR 29 from two lanes to four lanes.  This would require an additional 32–100 feet of right-of-way, necessitating the relocation of four residences and four businesses.  The planned expansion on SR 82 is even larger.  FDOT plans to transform SR 82 from a two-lane rural road into an eventual six-lane suburban highway with a 30-foot median, and will require right-of-ways for stormwater retention ponds.

30.     The road expansion segments at issue in this action are located within the USFWS' Panther Focus Area's primary and secondary habitat zones for the endangered Florida Panther.  The primary zone is land currently used by the panthers and essential to their long-term viability, while the secondary zone is land used by panthers and land that would accommodate any future growth of the panther population should it increase.

31.     More than a dozen panthers have been killed by motor vehicle collisions on or near the relevant segments, including two adults and a juvenile on the specific segments themselves.  SR 29 has proven to be one of the deadliest roads for panthers due to vehicular collisions claiming over 56 lives since 1980.

32.     These two road expansions are just a part of a long list of planned development in and near panther habitat.  In the coming years, over 55 miles of SR 29's 75 miles through prime panther habitat are slotted to be expanded and over half of SR 82's 23 miles are already actively in construction for expansion.

33.     On January 22, 2016, USFWS issued a biological opinion finding that the road widening on SR 29 would have adverse impacts on the Florida Panther but concluding that the project was not likely to jeopardize the panther's continued existence.

34.     On June 10, 2016, USFWS amended its biological opinion's mitigation requirement for installation of two wildlife underpasses to require the installation of underpasses "or other wildlife crossing feature or structure" for the SR 29 project.

35.     On April 11, 2017, FDOT invoked a categorical exclusion for the contested segment of SR 29, determining that the project would have no significant effects on the environment, and therefore did not warrant further review under NEPA.

36.     On June 29, 2018, USFWS issued a biological opinion finding that the road widening on SR 82 would also have adverse impacts on the Florida Panther, but concluding that it was not likely to jeopardize the panther's continued existence.

37.     On October 2, 2018, the Corps issued an Environmental Assessment and Statement of Findings under NEPA in conjunction with issuing a Clean Water Act (CWA) dredge and fill permit for the road widening on SR 82 (Permit No. SAJ- 2017-01376).  The Corps consulted with USFWS over impacts of the dredge and fill permit for SR 82, and USFWS produced a June 29, 2018 biological opinion.  Relying on the USFWS' biological opinion, the Corps concluded that while the SR 82 project would likely adversely affect the panther it would not likely jeopardize the panther's continued existence.

## LEGAL LANDSCAPE

**Endangered Species Act**

38.     Congress enacted the Endangered Species Act of 1973 (ESA) because human activities had caused the extinction of many species, and other species "[had] been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(1)–(2).  All species listed as endangered or threatened by the Secretary of Interior are protected by the ESA, which the Supreme Court has called "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. at 180 (1978) (hereinafter TVA).

39.     Recognizing the need to protect these species and to conserve their habitat, Congress mandated that all federal departments and agencies seek to conserve endangered and threatened species.  16 U.S.C. § 1531(c)(1).  "Lest there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined 'conserve' as meaning 'to use and the use of all methods and procedures that are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.'" TVA, 437 U.S. at 180 (quoting 16 U.S.C. § 1532(2) (emphasis omitted)).  "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." Id. at 184.

40.     ESA § 7(a)(2) places an affirmative duty on each federal agency, including USFWS and designees of the Federal Highway Administration such as FDOT, to ensure that its actions are "not likely to jeopardize the continued existence" of any

11

endangered or threatened species or "result in the destruction or adverse modification of habitat" of those species.  16 U.S.C. § 1536(a)(2).  "Jeopardize the continued existence of" is defined by regulation as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.").  50 C.F.R. § 402.02.

41.     This duty is not limited to efforts that will not interfere with what the agency deems its primary mission.  The "pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."  TVA, 437 U.S. at 185.

42.     If a federal agency determines that its actions may adversely affect any endangered or threatened species, the agency must formally consult with USFWS (for land-based species) to evaluate the current status of the species and the environmental baseline, as well as the proposed action and its direct, indirect, and cumulative effects.  50 C.F.R. §§ 402.02, 402.14(a), (g).

43.     As part of the consultation process, USFWS must determine whether the action, when added to the environmental baseline and together with any cumulative effects, is likely to jeopardize the continued existence of a species.  16 U.S.C. § 1536(b)(3)–(4); 50 C.F.R. §§ 402.02, 402.14(g).  This determination is set forth in a "biological opinion" and must be based on the "best scientific and commercial data available."  50 C.F.R. § 402.14(g)(8).

44.     The biological opinion must include a summary of the information upon which the opinion is based and a detailed discussion of "the environmental baseline of the listed species" and the "effects of the action."  Id. § 402.14(g)–(h).

45.     If USFWS concludes that a federal agency's proposed action will not jeopardize any listed species (called a "no-jeopardy" opinion), USFWS is required to include in its biological opinion an "incidental take statement" that authorizes the taking of listed species incidental to the proposed action.  16 U.S.C. § 1536(b)(4).  The incidental take statement must specify, among other things, "the impact, i.e., the amount or extent, of such incidental taking on the species."  50 C.F.R. § 402.14(i)(1)(i).

46.     Under § 9 of the ESA, it is illegal for any person, including a federal agency, to "take" any endangered or threatened animal except in compliance with an incidental take statement or other authorization.  16 U.S.C. §§ 1532(13), 1538(a)(1).  The ESA defines the term "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  Id. § 1532(19).

47.     Each federal agency has the duty to ensure that its actions do not jeopardize the continued existence and recovery of a species.  Id. § 1536(a)(2); 50 C.F.R. § 402.02.  The action agency likewise may not arbitrarily or capriciously rely on a "no-jeopardy" opinion.  5 U.S.C. § 706(2)(A).

**National Environmental Policy Act**

48.     The National Environmental Policy Act of 1969 (NEPA) is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  "The NEPA process is intended to help public officials make decisions that are based on

understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." Id. § 1500.1(c).  Agencies' evaluations must incorporate "[a]ccurate scientific analysis" and be based on "high quality" scientific information.  Id. § 1500.1(b).

49.     The Council on Environmental Quality (CEQ) has promulgated rules implementing NEPA.  These rules apply to all federal agencies, including the Corps, the FHWA and the FWHA's state designees.  See id. pt. 1500.

50.     NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  "Major federal actions" include both "new and continuing activities" with "effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  The "human environment" includes "the natural and physical environment and the relationship of people with that environment."  Id. § 1508.14.

51.     "Significan[ce]" depends on a number of factors, including the level of controversy surrounding the impact of the action, the presence of unique or uncertain risks, the potential for the action to establish precedent for future actions, whether the action has cumulatively significant impacts, and the possibility for adverse effects on an endangered or threatened species.  Id. § 1508.27.  The presence of any one of these factors is sufficient to require an EIS.

52.     When an agency is uncertain whether an impact will be significant, it may prepare an environmental assessment (EA) to evaluate these criteria and determine

whether a full EIS is required.  Id. § 1508.9(a)(1).  The agency must consider both the context and intensity of the proposed action including whether the project will take place in "ecologically critical areas" and whether the project will affect endangered species." Id. § 1508.27 (a), (b).  In addition, the agency must consider "the degree to which the action is related to other actions with . . . cumulatively significant impacts . . ."  Id. § 1508.27(b)(7).

53.     If, through preparation of an EA, the agency concludes that an EIS is not necessary, it must issue a finding that adequately explains why the project will "not have a significant effect on the human environment."  Id. § 1508.13.  If an action may have a significant effect on the environment, or if there are substantial questions about whether it may, an agency must prepare an EIS.

54.     Certain actions that agencies have found do not have significant individual or cumulative effects on the quality of the human environment may be categorically excluded under agency regulations from the requirement to prepare an EA or EIS.  Id. §§ 1501.4(a), 1508.4.

55.     Relying on this authority to create exemptions, FHWA has identified actions that are always categorically excluded from NEPA (described as "c-list" or "type 1" exclusions) and actions that may be categorically excluded after administrative review to determine that the action will create no significant environmental impacts (described as "d-list" or "type 2" exclusions).  23 C.F.R. § 771.117(c), (d).

56.     Actions that have been qualified for type 2 categorical exclusions include rehabilitating rail and bus facilities where there will not be a substantial increase in the

number of users, highway traffic and safety improvements such as adding traffic lights, or building fringe parking facilities.  Id. § 771.117(d).  However, even some such actions do not qualify for a categorical exclusion if they require additional elements, including acquisition of a "more than minor" amount of right-of-way or an individual permit for dredging and filling under the Clean Water Act.  Id. § 771.117(e).

57.     Under the Surface Transportation Project Delivery Program, the Secretary of the U.S. Department of Transportation may assign the FHWA's responsibilities under NEPA to the States through a memorandum of understanding.  23 U.S.C. § 327(a)(2)(A). When FHWA's NEPA responsibilities are assigned to a State entity, federal courts retain jurisdiction over suits against the State entity to enforce those NEPA responsibilities.  Id. § 327(c)(3)(B).

58.     The FHWA has assigned its NEPA responsibilities to FDOT for road projects like the ones challenged in this action in a December 14, 2016 Memorandum of Understanding.

**Administrative Procedure Act**

59.     The Administrative Procedure Act (APA) grants a right of judicial review of final agency actions to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.

60.     Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id. § 706(2)(A).

61.     The USFWS' biological opinions, the Corps' environmental assessment, and FDOT's categorical exclusion are "agency actions" subject to judicial review under the APA.

## **FIRST CLAIM FOR RELIEF**

## **(USFWS' BIOLOGICAL OPINION FOR SR 29 VIOLATES THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT)**

62.     Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1–5, 17–18, 23–34, 38–47, and 59–61 of this Complaint.

63.     USFWS' biological opinion regarding the impacts on the Florida Panther of FDOT's proposed SR 29 expansion as described herein is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

64.     Among other things, the biological opinion draws unreasonable conclusions and impermissibly fails to make a "rational connection between the facts found and the choice made," Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, 462 U.S. 87, 88 (1983), particularly regarding the impacts of development and associated habitat loss on the Florida Panther.

65.     The biological opinion impermissibly fails to analyze the baseline conditions and compare them with conditions anticipated after construction to assess whether the SR 29 project will result in any appreciable reduction in the likelihood of survival for the Florida Panther.

66.     The biological opinion impermissibly fails to address the cumulative impacts of the development or the increased traffic that the SR 29 expansion would

generate.  The biological opinion acknowledges that some future state and private development would likely not involve major federal action, and therefore avoid ESA consultation, yet fails to analyze the impacts of this anticipated development now, shielding those impacts from any environmental review.

68.     The biological opinion impermissibly fails to quantify the amount of anticipated take resulting from either vehicular collisions or habitat degradation.  This effectively gives FDOT unlimited take from vehicular collisions, without any analysis from USFWS that this would not jeopardize the continued existence of the Florida Panther.

68.     The biological opinion impermissibly omits a trigger for re-initiation of consultation for excessive take from vehicle collisions.

### SECOND CLAIM FOR RELIEF

**(USFWS' BIOLOGICAL OPINION FOR SR 82 VIOLATES THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT)**

69.     Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1–5, 17–18, 23–32, 36, 38–47, and 59–61 of this Complaint.

70.     USFWS' biological opinion regarding the impacts on the Florida Panther of FDOT's proposed SR 82 expansion as described herein is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

71.     Among other things, the biological opinion draws unreasonable conclusions and impermissibly fails to make a "rational connection between the facts

found and the choice made," <u>Baltimore Gas and Elec.</u>, 462 U.S. at 88, particularly regarding the impacts of development and associated habitat loss on the Florida Panther.

72.     The biological opinion impermissibly fails to analyze the baseline conditions and compare them with conditions anticipated after construction to assess whether the SR 82 project will result in any appreciable reduction in the likelihood of survival for the Florida Panther.

73.     The biological opinion impermissibly fails to address the cumulative impacts of the development or the increased traffic that the SR 82 expansion would generate.  The biological opinion acknowledges that some future state and private development would avoid ESA consultation, but fails to analyze these impacts now.

74.     The biological opinion impermissibly fails to quantify the amount of anticipated take resulting from either vehicular collisions or habitat degradation.  This effectively gives FDOT unlimited take from vehicular collisions, without any analysis from USFWS that this would not jeopardize the continued existence of the Florida Panther.

75.     The biological opinion impermissibly omits a trigger for re-initiation of consultation for excessive take from vehicle collisions.

### THIRD CLAIM FOR RELIEF

**(FDOT'S CATEGORICAL EXCLUSION FOR SR 29 VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE PROCEDURE ACT)**

76.     Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1–6, 19–20, 23–32, 35, and 48–61 of this Complaint.

77.     The categorical exclusion defendant FDOT prepared to assess the environmental impacts of the SR 29 expansion as described herein is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

78.     Among other things, the proposed expansion to SR 29 would have a significant effect on the quality of the human environment, and therefore requires further NEPA analysis.  A categorical exclusion is inappropriate where a project will result in the take of an endangered species, spur regional development, increase traffic, and require an increased right-of-way, all of which is the case here.

## FOURTH CLAIM FOR RELIEF

### (CORPS' ENVIRONMENTAL ASSESSMENT FOR SR 82 VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT AND ADMINISTRATIVE PROCEDURE ACT)

79.     Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1–5, 21–32, 36–37, 48–61, and 70–75 of this Complaint.

80.     The environmental assessment prepared by the Corps to assess the environmental impacts of a Clean Water Act dredge and fill permit application for the SR 82 expansion is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

81.     By relying on USFWS' inadequate biological opinion for the SR 82 expansion in its environmental assessment, the Corps impermissibly failed to take a hard

look at the cumulative impacts of its proposed action and articulate a rational connection between facts found and the finding of no significant impact.

## FIFTH CLAIM FOR RELIEF

### (CORPS' ARBITRARY RELIANCE ON INADEQUATE BIOLOGICAL OPINION FOR SR 82 VIOLATES THE ENDANGERED SPECIES ACT)

82.     Plaintiffs reallege and incorporate by reference allegations contained in paragraphs 1–5, 11, 21–32, 36–37, 48–61, and 70–75 of this Complaint.

83.     Before granting a Clean Water Act (CWA) dredge and fill permit, § 7(a)(2) of the ESA required the Corps to insure that the SR 82 project would not jeopardize the continued existence and recovery of the Florida Panther.

84.     Among other things, the biological opinion here draws unreasonable conclusions and impermissibly fails to make a "rational connection between the facts found and the choice made," Baltimore Gas & Elec. Co., 462 U.S. at 88, particularly regarding the impacts of development and associated habitat loss on the Florida Panther.

85.     The biological opinion impermissibly fails to analyze the baseline conditions and compare them with conditions anticipated after construction to assess whether the SR 82 project will result in any appreciable reduction in the likelihood of survival for the Florida Panther.

86.     The biological opinion impermissibly fails to address the cumulative impacts of the development or the increased traffic that the SR 82 expansion would generate.

87.     The biological opinion impermissibly fails to quantify the amount of anticipated take resulting from either vehicular collisions or habitat degradation.  This

effectively gives FDOT unlimited take from vehicular collisions, without any analysis from USFWS that the take would not jeopardize the continued existence or recovery of the Florida Panther.

88.     The biological opinion impermissibly omits a trigger for re-initiation of consultation for excessive take from vehicle collisions.

89.     By relying on USFWS' inadequate biological opinion and accompanying incidental take statement to issue the CWA dredge and fill permit for the SR 82 project, the Corps violated § 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Enter a declaratory judgment that:

i. USFWS has violated and is violating the ESA and APA by failing to prepare a legally adequate biological opinion and incidental take statement for the actions challenged here;

ii. FDOT, acting under a memorandum of understanding with FHWA, has violated and is violating NEPA and the APA by adopting and relying on a legally deficient Categorical Exclusion to avoid preparing an EA or EIS;

iii. The Corps has violated and is violating NEPA and the APA by adopting and relying on a legally deficient biological opinion in its environmental assessment;

b.   Vacate and set aside USFWS' biological opinions for the challenged
FDOT road expansion activities;

c.   Vacate and set aside FDOT's categorical exclusion for the challenged
FDOT road expansion activities;

d.   Vacate and set aside the Corps' environmental assessment and finding of
no significant impact for the challenged FDOT road expansion activities;

e.   Vacate and set aside the Corps' dredge and fill Permit No. SAJ-2017-
01376 issued for the challenged FDOT road expansion activities;

f.   Issue any appropriate injunctive relief;

g.   Allow the plaintiffs to recover the costs of this action, including attorneys'
fees to the extent authorized by law; and

h.   Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 30th day of March, 2020.

*/s/ Bonnie Malloy*
BONNIE MALLOY
(Fla. Bar No. 86109)
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

*/s/ Tania Galloni*
TANIA GALLONI
(Fla. Bar. No. 619221)
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137

T: (305) 440-5432
F: 850-681-0020
tgalloni@earthjustice.org

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this the 30th day of March, 2020 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

*/s/ Bonnie Malloy*
BONNIE MALLOY