# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

### Ft. Myers Division

| | |
|---|---|
| SIERRA CLUB and ENVIRONMENTAL CONFEDERATION OF SOUTHWEST FLORIDA, | |
| Plaintiffs, | Case No. 2:20-cv-00013-SPC-NPM |
| v. | |
| U.S. FISH AND WILDLIFE SERVICE *et al.*, | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[1]

---

[1] This motion is filed in accordance with the Court's June 4, 2021, Order granting an enlargement of the page limit for dispositive motions to up to sixty pages.  (ECF Nos. 82 and 91.)

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STANDARD .............................................................................................................. 3

STANDING ............................................................................................................... 4

BACKGROUND ...................................................................................................... 7

   I.   THE FLORIDA PANTHER IS CRITICALLY ENDANGERED AND
PARTICULARLY AT RISK OF DEATH FROM VEHICULAR STRIKES. .... 7

  II.  SOUTHWEST FLORIDA IS PROJECTED TO HAVE A VAST
EXPANSION IN DEVELOPMENT AND ROAD PROJECTS. ..................... 11

STATEMENT OF MATERIAL FACTS ................................................................ 13

ARGUMENT .......................................................................................................... 18

   I.   USFWS VIOLATED THE ESA BY FAILING TO SET A NUMERICAL
TAKE LIMIT FOR PANTHER DEATHS FROM VEHICULAR
STRIKES. ............................................................................................................ 19

      A.    USFWS Unlawfully Provided Take Liability Coverage for
Panther Vehicular Deaths Without Setting a Numerical Take
Limit. .................................................................................................. 20

      B.    The Amended BiOp Cannot Be Used to Justify USFWS'
Failure to Comply with the ESA. ...................................................... 28

      C.    The Amended BiOp Also Fails to Create a Numerical Trigger
for Panther Deaths from Vehicle Strikes............................................ 33

      D.    USFWS Cannot Justify Its Use of a Habitat Surrogate to
Extend Take Liability for Panther Deaths from Vehicle Strikes........ 36

  II.  USFWS' BIOPS FAIL TO EVALUATE THE EFFECTS OF THE
ACTION AND THE CUMULATIVE EFFECTS ON THE PANTHER. ....... 41

 III.  USFWS' BIOPS FAIL TO ANALYZE THE BASELINE CONDITIONS. ..... 52

 IV. THE CORPS' ACTIONS MUST BE SET ASIDE BECAUSE IT
UNLAWFULLY RELIED ON THE FLAWED SR 82 BIOPS WHEN
ISSUING ITS NEPA ANALYSIS AND THE CWA PERMIT. ...................... 58

  V.  THE CORPS FAILED TO ANALYZE CUMULATIVE IMPACTS.............. 59

CONCLUSION......................................................................................................... 60

**INTRODUCTION**

The Florida panther is one of the most endangered species on the planet.

Its only remaining habitat is in Southwest Florida, an area that is experiencing

rapid, expansive development.  A series of road projects in and around panther

habitat, including the project at issue in this litigation, both accommodate and

spur development.  They also pose a major threat to the Florida panther, with

vehicle strikes constituting one of the species' leading causes of death.

The Endangered Species Act ("ESA") guards against these dangers.  It

requires that federal projects not jeopardize the continued existence of a species

and prohibits the "take" of (meaning harm to) endangered species.  It also

requires U.S. Fish and Wildlife Service ("USFWS") to determine whether a

project will result in "incidental" take, for which the ESA imposes liability.

USFWS may shield a federal permittee, or their delegate, from liability for

incidental take only after establishing a limit on such take that will not jeopardize

the species.  This take limit is Congress' indispensable guardrail to ensure

against jeopardy of endangered species, as it requires the agencies to reinitiate

consultation should more harm occur than expected or should the agencies'

assumptions prove wrong.  Indeed, "[t]he plain intent of Congress in enacting

[the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." Tenn. Valley Auth. v. Hill, 437 U.S. at 180, 184 (1978).

In this case, USFWS determined that the Florida Department of Transportation's ("FDOT") expansion of State Road 82 ("SR 82") is likely to result in incidental take of the Florida panther in the form of vehicle strikes. USFWS shielded that take from liability but failed to quantify or set any limit on the anticipated take from vehicle strikes. USFWS authorized an unlimited number of panther deaths resulting from vehicle strikes and shielded those from liability, running afoul of the ESA. If allowed to stand, this approach portends enormous consequences for the panther as USFWS considers additional road projects, segment by segment, in the panther's remaining range.

USFWS further contravened the ESA by failing to perform an adequate analysis of the cumulative impacts that the SR 82 expansion—when considered along with the region's burgeoning development, increased traffic, and other road projects—would have on the species. The U.S. Army Corps of Engineers ("Corps") unreasonably relied on USFWS' legally deficient analyses and conclusions to produce a similarly flawed Environmental Assessment ("EA") of

the proposed project under the National Environmental Policy Act ("NEPA")

and to issue a related permit under the Clean Water Act ("CWA").

These agency actions are arbitrary and capricious, in violation of federal

law, and must be set aside under the Administrative Procedure Act, 5 U.S.C. §

706(2).  Plaintiffs therefore respectfully request that summary judgment be

granted in their favor and against USFWS as to Counts Two, Six, and Eight, for

violations of the ESA, 16 U.S.C. §§ 1531–1544, and in their favor and against the

Corps as to Counts Four, Five, and Seven, for violations of NEPA, 42 U.S.C.

§§ 4321–4370h, of the Second Amended Complaint.  (ECF No. 65.)[2]

## STANDARD

Summary judgment is appropriate "when the movant shows that there is

no genuine dispute of material fact and that the movant is entitled to judgment

as a matter of law."  Paez-Basto v. Acting Sec'y, Dep't of Homeland Sec., No.

6:13-CV-1955-ORL-31, 2014 WL 4809528, at *1 (M.D. Fla. Sept. 26, 2014) (citing

Fed. R. Civ. P 56(a)).  Under the Administrative Procedure Act ("APA"), a court

must "hold unlawful and set aside agency action, findings, and conclusions

found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[2] The Court previously dismissed Counts One and Three, which related to a different road
expansion project, as moot after concluding that the project had been cancelled.  (ECF No. 59.)

accordance with law." 5 U.S.C. § 706(2)(A).  To determine whether an agency

acted unlawfully, a court assesses whether the agency "examine[d] the relevant

data and articulate[d] a satisfactory explanation for its action." Motor Vehicle

Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983);

Sierra Club v. Johnson, 436 F.3d 1269, 1273–74 (11th Cir. 2006); Fla. Key Deer v.

Brown, 364 F. Supp. 2d 1345 (S.D. Fla. 2005) aff'd sub nom. Fla. Key Deer v.

Paulison, 522 F.3d 1133 (11th Cir. 2008).

The Court must consider whether the agency has "articulate[d] a

satisfactory explanation for [its] action including a rational connection between

the facts found and the choice made." Paez-Basto, 2014 WL 4809528, at *1.  For

NEPA claims in particular, a court's task is to "ensure that the agency took a

'hard look' at the environmental consequences." Black Warrior Riverkeeper, Inc.

v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1288 (11th Cir. 2015).

## STANDING

Plaintiffs have associational standing to pursue their claims. Friends of the

Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000); Ouachita

Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006); Cahaba Riverkeeper

v. U.S. Envtl. Prot. Agency, 938 F.3d 1157, 1162 (11th Cir. 2019).  They meet the

requirements for constitutional standing in that they have suffered an injury in

fact that was caused by Defendants' actions and that can be redressed by a favorable judicial decision requiring compliance with the ESA, NEPA, and the CWA.  Jacobs, 463 F.3d at 1170.

Plaintiffs submit ten declarations which demonstrate that their members have for decades been recreating in panther habitat, including by hiking, camping, canoeing, kayaking, biking, taking photographs and seeking to witness a panther in the wild.  Exhibits 1–10.  These members have and continue to regularly recreate in natural areas in the panther's last remaining habitat, like the Florida Panther National Wildlife Refuge, Everglades National Park, Big Cypress National Preserve, Corkscrew Swamp Sanctuary, Cypress Cove Sanctuary, and Okaloacoochee Slough State Preserve.  Exhibit 1 at 15 (Hollenhorst Dec. at ¶¶ 21–22); Exhibit 2 at 4-5 (Umpierre Dec. at ¶ 9); Exhibit 3 at 4 (Ayech Dec. at ¶ 9); Exhibit 4 at 4, 5 (Vasaturo Dec. at ¶¶ 8, 10); Exhibit 6 at 5 (Roff Dec. at ¶ 12); Exhibit 7 at 4 (Carle Dec. at ¶ 11); Exhibit 8 at 4-5 (Martin Dec. at ¶ 8); Exhibit 9 at 5-6 (Davenport Dec. at ¶¶ 11–12); Exhibit 10 at 5 (Rutz Dec. at ¶ 11).  They monitor and research panthers, report and educate the public about panthers, and advocate on behalf of the panther.  Exhibit 1 at 2-3 (Hollenhorst Dec. at ¶ 4); Exhibit 2 at 3 (Umpierre Dec. at ¶ 5); Exhibit 3 at 2-3, 7 (Ayech Dec. at ¶¶ 5, 17);

Exhibit 4 at 3 (Vasaturo Dec. at ¶ 5); Exhibit 5 at 2 (Whitehead Dec. at ¶ 4);

Exhibit 7 at 2, 3, 5 (Carle Dec. at ¶¶ 5, 7, 13); Exhibit 9 at 3-4, 7 (Davenport at ¶¶

6-7, 15); Exhibit 10 at 3, 6 (Rutz Dec. at ¶¶ 5, 14).   And some members have even

been fortunate enough to witness panthers in the wild.  Exhibit 1 at 13-14

(Hollenhorst Dec. at ¶ 18); Exhibit 2 at 1-2 (Umpierre Dec. at ¶ 2); Exhibit 6 at 6-7

(Roff Dec. at ¶¶ 13-14, 16); Exhibit 7 at 5 (Carle Dec. at ¶ 13) Exhibit 8 at 5 (Martin

Dec. at ¶ 10).

Defendants' actions create a substantial risk that the members' recreational

and aesthetic enjoyment of these areas as well as their ability to witness panthers

will be diminished.  Exhibit 1 at 12-13, 16-18 (Hollenhorst Dec. at ¶¶ 15, 17, 24,

26- 27); Exhibit 2 at 9-10 (Umpierre Dec. at ¶¶ 19-21); Exhibit 3 at 6-8 (Ayech Dec.

at ¶¶ 15, 17-18); Exhibit 4 at 8-10 (Vasaturo Dec. at ¶¶ 19-21, 23); Exhibit 5 at 7-8

(Whitehead Dec. at ¶¶ 16, 18); Exhibit 6 at 9-10 (Roff Dec. at ¶¶ 20-21, 23); Exhibit

7 at 7-8 (Carle Dec. at ¶ 18); Exhibit 8 at 8-9 (Martin Dec. at ¶¶ 15-16); Exhibit 9 at

8-9 (Davenport Dec. at ¶¶ 18-19); Exhibit 10 at 8-9 (Rutz Dec. at ¶¶ 18-19, 21).  As

Ms. Hollenhorst explained, "To me, the Panther represents wilderness, and the

entire reason I moved to Florida was to be closer to true wilderness.  If the

Panthers are gone, or functionally gone, I'll never see Florida the same way."

Exhibit 1 at 17 (Hollenhorst Dec. at ¶ 17).  These interests fall within the

Plaintiffs' organizational missions.  Exhibit 1 at 3 (Hollenhorst Dec. at ¶¶ 5-6);

Exhibit 2 at 2 (Umpierre Dec. at ¶ 4); Exhibit 3 at 2 (Ayech Dec. at ¶ 4); Exhibit 4

at 2 (Vasaturo Dec. at ¶ 4); Exhibit 5 at 3 (Whitehead Dec. at ¶ 5); Exhibit 6 at 3

(Roff Dec. at ¶ 6); Exhibit 7 at 2 (Carle Dec. at ¶ 4); Exhibit 8 at 2 (Martin Dec. at ¶

4); Exhibit 9 at 2 (Davenport Dec. at ¶ 5); Exhibit 10 at 2 (Rutz Dec. at ¶ 4).

Plaintiffs therefore have standing.

## BACKGROUND

I.   **The Florida Panther Is Critically Endangered and Particularly at Risk of Death from Vehicular Strikes.**

The Florida panther is one of the most endangered species in the world,

with a population of only between 120 and 230 adult panthers left in the wild.  J.

Cox et al., <u>Florida Panther Habitat Use: New Approach to an Old Problem</u> (2006)

(A.R. 4778-85); Letter from U.S. Fish & Wildlife Serv. to Jason A. Kirk, U.S. Army

Corps of Eng'rs (June 30, 2020) (A.R. 8599) (hereinafter "Am. BiOp").[3]  According

to verified population estimates, USFWS has anticipated that the current panther

population is still of such a small size that the species may continue to suffer

---

[3] Documents in the administrative record ("record") produced by USFWS are cited as follows: A.R. and the applicable bate stamp number(s).  Documents in the record produced by the Corps are cited as follows:  CORPS A.R. and the applicable bate stamp number(s).  Plaintiffs understand that the Federal Defendants will soon be lodging the administrative record with the court.

from genetic problems, which further threaten the panther's survival.[4]  2015

Status at 11 (A.R. 7247).

Studies that USFWS has relied upon in its conservation efforts show that

the Florida panther population would need to reach 240 individuals or more to

have a high probability of persistence, be demographically stable, and be large

enough to maintain genetic diversity.  2015 Status at 11 (A.R. 7247); Recovery

Plan at 113 (A.R. 5182) (same).  And in the Recovery Plan for the panther, USFWS

itself explained that taking the panther off the Endangered Species list could only

be considered when three, viable, self-sustaining populations of at least 240

individuals each have been established and maintained for at least twelve years.

Recovery Plan at 12 (A.R. 5082).

Vehicular collisions are a leading cause of panther deaths, representing a

"significant source of mortality" for the Florida panther.  2015 Status at 12 (A.R.

7248).  Between 1979 and May 2020, 242 panthers were hit by vehicles in

Southwest Florida and 236 of those panthers died because of their injuries.  Am.

BiOp at 8 (A.R. 8601).  These deaths occur when panthers attempt to cross

---

[4] In the past, a lack of genetic variation resulting from the panther's small population size
required scientists to intervene and introduce females from another cougar species as a means
to save the panther from extinction.  U.S. Fish & Wildlife Serv., Status of the Species—Florida
Panther (Puma concolor coryi) 8 (2015) (A.R. 7244) (hereinafter "2015 Status"); U.S. Fish &
Wildlife Serv., Florida Panther Recovery Plan 26-27 (2008) (A.R. 5095-96) (hereinafter "Recovery
Plan").

highways; as traffic increases, so does the potential for collisions.  Id.  In fact, in portions of the panther's range, the rate of vehicle-related panther deaths may be increasing.  Studies have shown an increase by a factor of four from 2000 to 2005 in Collier County, where the road segment at issue is located.  Id.

The Florida panther is also particularly susceptible to habitat loss and segregation, which further imperils the species.  Historically occurring throughout the Southeastern United States, today the panther is restricted to less than 5% of its natural range and is primarily located in widely scattered and fragmented habitat in Southwest Florida.  2015 Status at 6–7 (A.R. 7242-43) ("Major highways and urban or agricultural development isolate these habitat patches, and they are rapidly being lost to the same development that threatens southern Florida.")

Florida panthers are wide-ranging carnivores with an average home range spanning from tens to hundreds of thousands of acres.  2015 Status at 4 (A.R. 7240).  As such, panthers require large areas to meet their hunting, foraging, and breeding needs, and are particularly sensitive to habitat fragmentation.  Id. at 4, 12 (A.R. 7240, 7248).  As USFWS has explained, the long-term survival of panthers could require as much as 156,000 to 234,000 square miles (roughly 60–

70% of the panther's historical range) of habitat, in contrast to the 3,548 square miles now occupied by the panther in South Florida.  2015 Status at 6 (A.R. 7242); Recovery Plan at 43–44 (A.R. 5112-13).  Furthermore, connections between panther habitat areas are vital for the species' survival because small, segregated patches of habitat will not provide panthers what they need to survive.  Cindy Thatcher et al., <u>A Habitat Assessment for Florida Panther Population Expansion Into Central Florida</u>, 90(4) J. of Mammalogy 919, 923-24, at 6-7 (2009), (A.R. 5308-09); Karen Root, <u>Florida Panther: Using Models to Guide Recovery Efforts</u> 4, <u>in Species Conservation and Management: Case Studies</u> (H.R. Akçakaya et al, eds. 2004) (A.R. 4542).

These threats are exacerbated by development and road projects. "[C]onstructing new and expanding existing highways may increase traffic volume and impede panther movement within and between frequently used habitat blocks throughout the landscape."  Recovery Plan at 56–57 (A.R. 5125–26).  And such expansions "may limit the panther's ability to cross highways and may ultimately isolate some areas of panther habitat."  <u>Id.</u>

Road expansions in and around Florida panther habitat will likely result in more panther deaths from vehicle strikes, less space for them to roam, and

increasingly fragmented habitat, interfering with the panthers' movement, foraging, and mating.  Recovery Plan at 56–57 (A.R. 5125–26).  The expansion of highways and accompanying increases in traffic volume and speed directly eliminate panther habitat and "impede movement within and between frequently used habitat blocks."  Id.

## II.    Southwest Florida is Projected to Have a Vast Expansion in Development and Road Projects.

The remaining home of the Florida panther, Southwest Florida, continues to develop, grow, and expand roads, which further stimulates growth and development.  Development in Southwest Florida has been exceedingly rapid in recent years, with over 350 square miles of undeveloped lands lost between 1985 and 2003 in Collier, Lee, and Hendry Counties—prime panther habitat areas. Recovery Plan at 53, 55, 63 (A.R. 5122, 5124, 5132).  And more land losses are on the way.  For example, studies project that the human population in these counties will increase by 55% between 2000 and 2030.  Randy Kautz, et al., How Much Land is Enough?  Landscape-scale Conservation for the Florida Panther 2, (2006) (A.R. 4787) (hereinafter "Kautz 2006").  More people mean less land for the panther; and more and wider roads increase the risk of vehicle strikes. Recovery Plan at 68 (A.R. 5137).

Accompanying these developments is a long list of road expansion projects in and near prime panther habitat.[5]  For example, in the coming years, FDOT intends to expand almost fifty-five miles of SR 29's seventy-five miles, almost all of SR 82, and parts of I-75 through prime panther habitat.  Exhibit 1 at 10-11 (Hollenhorst Dec. at ¶ 13).  These sets of road projects alone span 120 miles and impact locations where roughly 70 panthers have died from vehicle strikes between February 1972 and January 2021.  Id.  SR 29 is one of the deadliest roads for panthers in the state and slotted to double in size from two lanes to four lanes across at least four highway segments.[6]  Exhibit 1 at 11 (Hollenhorst Dec. at ¶ 13).

FDOT similarly plans to transform SR 82 from a two-lane rural road into an eventual six-lane suburban highway with a 30-foot median and rights-of-way for stormwater retention ponds.  See Letter from U.S. Fish & Wildlife Serv. to Jason A. Kirk, U.S. Army Corps of Eng'rs at 3 (June 30, 2020) (A.R. 8275)

---

[5] The Court may take judicial notice of public records and information available on a government website.  Fed. R. Evid. 201(b); Universal Express, Inc. v. U.S. S.E.C., 177 Fed. App'x 52, 53 (11th Cir. 2006) (public record); R.S.B. Ventures, Inc. v. F.D.I.C., 514 Fed. App'x 853, 856, n.2 (11th Cir. 2013) (information available on a government website).  See, e.g., Fla. Dep't of Transp., Strategic Intermodal System Long Range Cost Feasible Plan FY 2029–2045 at 10 (July 2018), https://www.fdot.gov/planning/systems/programs/mspi/plans/default.shtm (listing planned projects in Southwest Florida and panther habitat areas) (Exhibit 11); Fla. Dep't of Transp., Strategic Intermodal System, First Five Year Plan Project Catalogue FY 2019–2024, 1–64, https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/planning/systems/programs/mspi/pdf/first5projects_finaldraft_8-16-19-lowres.pdf?sfvrsn=fec697e8_2 (Exhibit 12).
[6] Although FDOT has withdrawn a Type II Categorical Exclusion under NEPA and a Location and Design Concept Acceptance for the eighteen-mile segment of SR 29 originally challenged by Plaintiffs, the project is still planned. Exhibit 1 at 18-19 (Hollenhorst Dec. at ¶ 20); ECF No. 35-4; ECF No. 35-3 (requesting rescission because construction funding is not scheduled for at least 10 years, not because project is terminated or not anticipated).

(hereinafter "BiOp").  Like many of these road segments, the SR 82 expansion segment lies between several preserves and agricultural lands, forcing the wide-ranging carnivore to cross the road for hunting, breeding, and roaming.  Exhibit 1 at 13 (Hollenhorst Dec. at ¶ 16); see also BiOp at 10 (A.R. 8282).

### STATEMENT OF MATERIAL FACTS

1.  There are between 120 and 230 adult Florida panthers left in the wild. Amended BiOp at 6 (A.R. 8599).

2.  The Florida panther population would need to reach 240 individuals or more to have a high probability of persistence, be demographically stable, and be large enough to maintain genetic diversity.  2015 Status at 11 (A.R. 7247).

3.  Taking the panther off the Endangered Species list could only be considered when three, viable, self-sustaining populations of at least 240 individuals each have been established and maintained for at least twelve years. Recovery Plan at 12 (A.R. 5082).

4.  The greatest threats facing the panther are vehicle strikes, intraspecies aggression, and habitat loss and fragmentation.  BiOp at 7 (A.R. 8279).

5.  Between 1979 and May 2020, 242 Florida panthers were hit by vehicles, with 236 of those perishing as a result.  Am. BiOp at 8 (A.R. 8601).

6.   FDOT plans to widen SR 82 from two paved lanes to four and enlarge the right-of-way to allow for future widening to six lanes.  BiOp at 3 (A.R. 8275).

7.   The SR 82 expansion is in the Florida panther's secondary habitat zone, which consists of natural and disturbed lands that have potential to support an expanding panther population.  Kautz 2006 at 6–7, 13 (A.R. 4791–92, 4798); BiOp at 8, 11 (A.R. 8280, 8283); Recovery Plan at 44 (A.R. 5113).

8.   Secondary zone habitat—along with the primary and dispersal zone habitats—"comprise essential components of a landscape-scale conservation plan for the protection of a viable panther population in south Florida."  Kautz 2006 at 14 (A.R. 4799).

9.   On April 26, 2018, USFWS initiated formal consultation on panther impacts for the SR 82 expansion project.  BiOp at 2 (A.R. 8574).

10. On June 29, 2018, USFWS issued a Biological Opinion ("BiOp") finding that the SR 82 road expansion would adversely impact the Florida panther but not jeopardize its continued existence.  Id. at 1 (A.R. 8273).

11. The BiOp includes an Incidental Take Statement ("ITS") that extends liability coverage for any direct take stemming from the "adverse effects" of the road expansion.  Id. at 17 (A.R. 8289).

12. A Florida panther has been killed within the SR 82 project action area and that another has died within the project footprint.  Id. at 8 (A.R. 8280).

13. Panthers are known to inhabit the project action area,[7] with 6,000 radio-transmitted observations from 145 collared panthers documented there.  Id.

14. There have been 300 verified panther sightings in the action area between September 5, 2018, and January 11, 2018.  Id.

15. Panthers have a "habit" of crossing busy roads.  BiOp at 12 (A.R. 8284).

16. Traffic and the threat of vehicular strikes are expected to increase on this road.  Id. at 12-13 (A.R. 8284–85).

17. "[I]t is likely that over the life of the Project, panthers may be injured or killed by collisions with motor vehicles using the widened roadway."  Id. at 12–13 (A.R. 8284–85).

18. The ITS does not include a numerical take limit for panther deaths resulting from vehicle strikes.  Id. at 17 (A.R. 8289).

19. The BiOp only requires FDOT to reinitiate consultation if its project impacts a larger geographical area than was planned.  Id. at 18 (A.R. 8290).

---

[7] The action area includes the lands with the project's footprint—the "construction footprint"—and "all lands located in the Service's panther Focus Area … within 25 mi of the Project footprint."  BiOp at 5 (A.R. 8277).

20. USFWS has relied on verified panther population estimates to assess the size and number of home ranges, travel corridors that panther use, and yearly breeding activity to make decisions about panther conservation efforts. Determining the Size of the Florida Panther Population (2017) (A.R. 7958–59); BiOp at 8 (A.R. 8280).

21. The BiOp compared the physical loss of habitat from construction of this project to the panther's sizeable range when discussing effects of the project and cumulative effects.  BiOp at 11, 15 (A.R. 8283, 8287).

22. Over 350 square miles of undeveloped lands were lost between 1985 and 2003 in Collier, Lee, and Hendry Counties.  Recovery Plan at 53, 55, 63 (A.R. 5122, 5124, 5132).

23. Studies project that the human population in these counties will increase by 55% between 2000 and 2030.  Kautz 2006 at 2 (A.R. 4787).

24. On October 2, 2018, the Corps relied on USFWS' BiOp when issuing an EA pursuant to its NEPA obligations in conjunction with issuing a CWA dredge and fill permit for the road widening on SR 82.  Department of the Army Environmental Assessment and Statement of Findings for SAJ-2017-01376, Corps

19, at 37–39, 46 (2018) (CORPS A.R. 4604–51) (hereinafter "EA"); Permit No. SAJ-2017-01376, Corps at 6 (2018) (CORPS A.R. 5344–5436) (hereinafter "404 Permit").

25. On January 9, 2020, Plaintiffs filed this action challenging USFWS' BiOp and the other agencies' actions that unreasonably relied on it.   (ECF No. 1.)

26. On January 9, 2020, Plaintiffs sent a notice of intent to sue regarding the Corps' reliance on USFWS' BiOp for SR 82.  (A.R. 8553–58).

27. On March 30, 2020, Plaintiffs amended the Complaint to add the 60-day notice claim against the Corps.  (ECF No. 24.)

28. On or about June 24, 2020, the Corps and USFWS reinitiated consultation on the SR 82 project "in light of concerns raised by [the Plaintiffs] in the notice of intent to sue."  Email from Andrew A. Kizlauskas, U.S. Army Corps of Eng'rs, to John Wrublik, U.S. Fish & Wildlife Serv., at 1 (Jun. 24, 2020) (A.R. 8585–86) (hereinafter "Corps 2020 Email").

29. On June 30, 2020, USFWS issued an "Amended Biological Opinion," ("Amended BiOp") reaching the same conclusions as to jeopardy and take stating it was to "clarify" findings "[c]onsidering recent litigation challenging this Project with respect to the panther."  Am. BiOp at 1 (A.R. 8594).

30. The Corps relied upon and incorporated the Amended BiOp into a CWA 404 permit modification and supplemental EA.  Letter from Andrew D. Kelly, Corps, to Nicole Monies, Fla. Dep't of Transp., Sept. 29, 2020 (CORPS A.R. 7180-7282) (hereinafter "404 Permit Modification"); Supplement to the Department of the Army Environmental Assessment and Statement of Findings for SAJ-2017-01376 (2020), at 1–4 (CORPS A.R. 7242–47) (hereinafter "Supplemental EA").

31. On January 5, 2021, Plaintiffs filed the Second Amended Complaint, which added the Defendants' post-suit actions.  (ECF No. 65.)

32. On January 19, 2021, the Defendants filed their answer (ECF No. 67), and on January 26, 2021, FDOT filed its answer (ECF No. 71.)

33. On September 30, 2021, the Magistrate Judge denied Plaintiffs' December 14, 2020, motion to: (1) compel a privilege log identifying withheld documents, (2) consider extra-record materials, and, in the alternative, (3) take judicial notice of two reports proffered by the Plaintiffs.  (ECF No. 87.)

34. On October 14, 2021, Plaintiffs timely filed objections to the Magistrate's order as contrary to law.  (ECF No. 89.)

## ARGUMENT

USFWS has provided FDOT with a safe haven for an unlimited number of Florida panther deaths from vehicle collisions resulting from the SR 82

expansion.  It did this despite acknowledging that such deaths would likely

occur, that such deaths had already occurred in the project footprint and on the

road segment at issue, and that vehicle strikes are one of the primary causes of

death for the panther.  Rather than setting a numerical take limit, USFWS

unlawfully relied on a *habitat* surrogate that has no connection with—and fails to

limit take from—vehicle strikes.  USFWS then failed to analyze the impacts that

development and road projects will cumulatively have on the panther

population.  The Corps unreasonably relied on USFWS' action to issue a permit

for the project.  USFWS' BiOps for the SR 82 expansion, as well as the Corps'

reliance on them, are unlawful and must be set aside.  Plaintiffs now move for

summary judgment as to Count Two and Counts Four through Eight for their

claims under the ESA, NEPA, and the CWA.

## I.    USFWS Violated the ESA by Failing to Set a Numerical Take Limit for Panther Deaths from Vehicular Strikes.

Under the ESA, an ITS must specify the amount and extent of incidental

take of the listed species that may occur without causing jeopardy or adverse

modification before USFWS may extend protection from liability for incidental

take.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)–(5).  This number denotes the

unacceptable level of take that, if met, would invalidate the safe harbor from take

liability and would by law trigger a federal agency to immediately reinitiate consultation to review and improve the conservation measures to minimize that take. 50 C.F.R. §§ 402.14(i)(4), 402.16(a); Miccosukee Tribe of Indians of Fla. v. United States ("Miccosukee Tribe I"), 566 F.3d 1257, 1274 (11th Cir. 2009); Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1249 (9th Cir. 2001) (collecting cases). An "ITS *cannot be effective* in its purpose if there is no such 'trigger' to require the agency to reconsider its approval of the incidental take." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 235 F. Supp. 2d 1143, 1160 (W.D. Wash. 2002) (emphasis added).

USFWS, however, failed to comply with the ESA when it extended take liability coverage without establishing a numerical take limit for vehicular strikes because of the SR 82 expansion. Moreover, USFWS' ITS relies on an unlawful habitat surrogate that bears no connection to vehicular strikes, that sets the take limit only as the acreage that FDOT planned to destroy for the expansion, and that fails to include any meaningful mechanism for reinitiation of consultation.

## A. USFWS Unlawfully Provided Take Liability Coverage for Panther Vehicular Deaths Without Setting a Numerical Take Limit.

Even though USFWS found that panthers will likely be killed by vehicle strikes from operation of the SR 82 expansion, it extended unlimited take liability

coverage.  USFWS failed to provide any numerical limit beyond which incidental take would be deemed unacceptable.  By not setting a limit, USFWS failed to provide a trigger to require the agency to reinitiate consultation and determine whether additional protective measures were necessary.  USFWS provided no explanation for these failures.  BiOp at 17 (A.R. 8289).

Courts have recognized that a take limit should be expressed as a specific number, as Congress intended.  See Miccosukee Tribe I, 566 F.3d at 1274 (recognizing Congress' preference for a numerical take limit); see also Ariz. Cattle Growers', 273 F.3d at 1249 (ITS should use numerical take limit); Oregon Nat. Res. Council v. Allen, 476 F.3d 1031, 1037 (9th Cir. 2007) (same); Ctr. for Biological Diversity v. Bernhardt, 982 F.3d 723, 750 (9th Cir. 2020) (same).

The Court of Appeals for the Eleventh Circuit has held that USFWS must establish a numerical take limit unless it is "impractical to do so."  Miccosukee Tribe I, 566 F. 3d at 1274–75.  Accord Miccosukee Tribe of Indians of Fla. v. United States ("Miccosukee Tribe II"), 697 F. Supp. 2d 1324, 1331 (S.D. Fla. 2010) (quoting Ariz. Cattle Growers', 273 F.3d 1229, 1250 (9th Cir. 2001)).  "In this context, impracticality means that it was *not possible* to use *some* form of

numerical population count." Miccosukee Tribe II, 697 F. Supp. 2d at 1331 (collecting cases) (emphasis added).

"Three important factors relevant to assessing the practicality of establishing a numerical incidental take trigger include: (1) the availability and quality of actual or estimated population figures; (2) the ability to measure incidental take; and (3) the ability to determine the extent to which incidental take is attributable to the action prompting the biological opinion and incidental take statement, as opposed to other environmental factors." Miccosukee Tribe II, 697 F. Supp. 2d at 1331. These factors show that USFWS could have made a numerical take limit for panther deaths from vehicle strikes for this project.

First, estimated population figures are available for panthers in Southwest Florida. Id. at 1331. "[T]he availability of population data increases the likelihood that establishing a numerical incidental take trigger is practical." Id. at 1332. USFWS was and is in possession of ample information estimating, describing, and tracking the Florida panther population. In fact, as USFWS itself explained, a team of researchers collect panthers' radio-transmitted location data three days per week, creating a large database of recorded panther locations. BiOp at 7–8 (A.R. 8279–80); Recovery Plan at 84 (A.R. 5173). This data has been

collected through decades of radio-transmitted and aerial surveys, physical evidence collection, and physical surveying.[8]

This case is thus similar to Miccosukee Tribe I, where the Eleventh Circuit was unpersuaded by USFWS' argument that it was not possible to create a numerical population-level take limit for affected bird species. 566 F.3d at 1274. In that case, USFWS contended that the birds had "secretive" behavior, "cryptic" coloring, and "move[d] over expansive and remote areas." Id. at 1275. The court rejected these arguments, however, given that USFWS had spent a "great deal of time actually counting these particular birds and creating yearly population data based on their efforts." Id. Compared to those bird species, Florida panthers are even easier to measure because they are tracked and counted regularly, live on land (rather than in the air or sea), and have a very limited geographic range.

---

[8] See, e.g., BiOp at 8, 12–13 (A.R. 8280, 8284-85); Recovery Plan at 31–33 (A.R. 5100-02) (summarizing decades of population data); Fla. Fish & Wildlife Conservation Comm'n, Annual Report on the Research and Management of Florida Panthers: 2013–2014 (2014) (A.R. 7065-7145) (hereinafter "Annual Report 2013–2014"); Roy McBride et al., Florida Panther Annual Count 2012 (A.R. 6012-33) (hereinafter "Annual Survey 2012"); Roy McBride et al., Florida Panther Annual Count 2010 (2010) (A.R. 5501-20) (hereinafter "Annual Count 2010"); Deborah Jansen et al., Florida Panther (Puma concolor coryi) Research and Monitoring in Big Cypress National Preserve 2004–2005 Annual Report (2005) (A.R. 4735–65); Darrell Land et al., Panther Genetic Restoration Management Annual Report 2002–2003 (2003) (A.R. 4204–4316) (hereinafter "Panther Genetic Restoration Report 2002–2003"); Roy McBride, The Documented Panther Population (DPP) and Its Current Distribution from July 1, 2002 to June 30, 2003 (2003) (A.R. 4192-4203); Roy McBride, Current Panther Distribution, Population Trends, and Habitat Use Report of Field Work: Fall 2000–Winter 2001 (2001) (A.R. 3918-43).

Second, USFWS could have measured the incidental take that would result

from vehicle strikes on the SR 82 expansion.  Miccosukee Tribe II, 697 F. Supp. 2d

at 1331.  Importantly, USFWS has previously estimated panther deaths resulting

from vehicle strikes due to increased traffic from a federal action.  Letter from

U.S. Fish & Wildlife Serv. to Andrew D. Kelly, Corps, at 14 (Jan. 29, 2019)

(hereinafter "Corkscrew BiOp") (Exhibit 13).[9]  In the biological opinion for Big

Corkscrew Island, USFWS requested a Traffic Impact Study from the applicant.

Id. at 2.  USFWS then used traffic projections from that study as well as historical

traffic volume data from the Collier County Traffic Operations Department and

FDOT to "estimate the risk to for [sic] panther mortality due to anticipated

Project-generated traffic."  Id. at 14.  Using this data, USFWS calculated an

estimated total of vehicle-related panther deaths that may occur during the next

five years on the roads at issue and concluded that the number would be less

than one.  Id.  USFWS therefore found that "there will be no take of panthers

from Project-generated traffic," and the biological opinion therefore did not

_____

[9] Plaintiffs request that the Court take judicial notice of the fact that USFWS issued the
Corkscrew Biological Opinion and created a numerical estimate of take from vehicle collisions
resulting from the agency action at issue.  See Fed. R. Evid. 201(b); Universal Express, Inc., 177
Fed. App'x at 53.  See also, Letter from U.S. Fish & Wildlife Serv. to Kimberly D. Bose, Fed.
Energy Reg. Comm'n, (Oct. 1. 2019) (setting numerical take limit of 1 ocelot and 1 jaguarundi
despite difficulty predicting movement and potential vehicular strikes) (Exhibit 14).  See also
Sierra Club v. U.S. Dept. of Interior, 990 F.3d 909, 913-14 (5th Cir. 2021).

extend liability coverage for such take.  Id.  That USFWS has estimated a number for take of panthers from vehicle strikes caused by increased traffic from projects in Southwest Florida demonstrates that it is not impossible for the agency to do. It just failed to do so here.

Additionally, the record shows that USFWS had ample information from which it could measure the number of vehicular strikes that would occur because of SR 82 expansion.  USFWS had specific data on the historical incidence of vehicular strikes on SR 82 pre-expansion: a Florida panther had been killed within the project action area on SR 82 just months preceding the BiOp and another panther died within the project footprint in 2012.  BiOp at 8 (A.R. 8280). Takes from vehicle strikes are measurable particularly because they occur on roads, where humans can find and identify panthers that have been struck and hit by vehicles.  This fact is further demonstrated by USFWS record evidence that clearly identifies panther deaths resulting from vehicle strikes down to the roads upon which the strikes occurred.[10]

The nature of the take at issue here makes this case distinguishable from

National Parks Conservation Association v. U.S. Department of Interior

---

[10] See, e.g., Annual Report 2013–2014 at appx. IV (A.R. 7133-45); Annual Count 2010 at 16–20 (A.R. 5516-20).

("NPCA"), 46 F. Supp. 3d 1254, 1335 (M.D. Fla. 2014), adhered to on reconsideration, No. 2:11-CV-578-FTM-29CM, 2015 WL 476163 (M.D. Fla. Feb. 5, 2015), aff'd 835 F.3d 1377 (11th Cir. 2016), and aff'd 835 F.3d 1377 (11th Cir. 2016), and Miccosukee Tribe II, 697 F. Supp. 2d at 1335.  In NPCA, the take at issue was not from vehicular strikes and it was not lethal take.  46 F. Supp. 3d at 1335. Instead, the panther takes at issue involved "harassment" resulting from recreational vehicle use in a portion of a national preserve.  Id.  In that context, the court found that a numerical take limit was impracticable, because USFWS could not estimate how many panthers would occur within the project footprint and in turn how many panthers would be harassed by recreational vehicles.  Id. Similarly, in Miccosukee Tribe II, the district court found that it was likely impracticable for USFWS to measure take at the individual level for affected sparrows because USFWS could not count every egg, adult, nestling, or juvenile who might be affected by the water management actions at issue.  697 F. Supp. 2d at 1327, 1335.

When it comes to vehicular strikes, by contrast, estimates of take are not impossible to calculate nor is it difficult to measure panthers that have been killed by a vehicle strike on a particular road.  USFWS has proven it can make

such an estimate because it has already done so for another project.  And, unlike generalized take from the broader "harassment" within a vast preserve that may not even be detectable, here, USFWS has shown it can (and already does) maintain regular, well-documented data on the annual panther deaths resulting from vehicle strikes, including their number and locations—even those that have occurred on the very road segment at issue.[11]

Finally, USFWS would have been able to determine the take that would be attributable to vehicle strikes resulting from the SR 82 expansion "as opposed to other environmental factors."  Miccosukee Tribe II, 697 F. Supp. 2d at 1331.  As demonstrated above, USFWS already monitors panther deaths and determines which deaths resulted from vehicle strikes, as opposed to other environmental factors, and determines the locations of those strikes.  USFWS said nothing in the BiOp to suggest it cannot similarly attribute anticipated panther deaths from vehicle strikes resulting from the SR 82 expansion.

By extending blanket take liability protection after acknowledging anticipated panther deaths from vehicular strikes, but refusing to estimate or limit vehicular deaths, USFWS effectively sanctioned an unlimited number of

---

[11] See, e.g., BiOp at 8 (A.R. 8280); Annual Report 2013–2014 at appx. IV (A.R. 7133-45); Annual Survey 2012 at 18–22 (A.R. 6029-33); Annual Count 2010 at 16–20 (A.R. 5516-20).

panther deaths.  Under this formulation, no number is too high and no number triggers a mandatory re-initiation of consultation.  Although USFWS may argue that it can always reinitiate consultation if new information comes to light, that does not relieve the agency of the duty to identify a limit beyond which take is unacceptable and to set a trigger.  Were it otherwise, the general authority to reinitiate consultation in light of new information would eviscerate the congressional mandate to specify the impact of takes and minimize that impact.

USFWS bears the burden to establish that it could not practically estimate a numerical value for take from vehicular strikes, and it cannot meet that burden here.  See Ctr. for Biological Diversity, 422 F. Supp. 2d at 1137 (requiring USFWS to show it could not establish a numerical value).  Instead, USFWS had ample data and scientific research that it could have used to estimate panther deaths from traffic on the SR 82 expansion.  Its failure to do so was arbitrary and capricious and its BiOp must be set aside.  5 U.S.C. § 706(2)(A).

**B.**    **The Amended BiOp Cannot Be Used to Justify USFWS' Failure to Comply with the ESA.**

USFWS' transparent attempt to inject post-hoc rationalizations of its prior decision through a sham Amended BiOp should be rejected.  See Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947); Gifford Pinchot Task Force v.

U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1076–77 (9th Cir. 2004) (rejecting attempt to amend biological opinions during litigation).  That USFWS claimed to have engaged in a reinitiation of consultation does not withstand scrutiny, because the agency expressly stated it had done so to bolster its position in litigation and failed to conduct any new analyses or review new information.

By regulation, reinitiation of consultation is designed for specific purposes, namely to address circumstances when (1) take limits are exceeded; (2) new information reveals that an action will affect protected species in a manner or to an extent not previously considered; (3) an action is modified in a way that causes an effect not already considered by USFWS; or (4) a new species that may be affected is listed.  50 C.F.R. § 402.16(a).  Under these circumstances, USFWS must revisit its determinations, including by reviewing all relevant information, evaluating the baseline of affected species, evaluating the individual and cumulative effects of the action, adding these impacts to the baseline to determine whether jeopardy will occur, establishing reasonable and prudent alternatives, and creating an incidental take statement if take will occur.  Id. § 402.14(g)(1)–(7).  But USFWS did none of these things here.

USFWS asked the Corps to reinitiate consultation for the sole purpose of "clarify[ing]" its reasons for making the decision it made in 2018 because the agency was sued.  Corps 2020 Email at 2 (A.R. 8586).  Even the Corps questioned this process, stating that it knew of no reason to reinitiate, aside from this lawsuit.  Id. at 1 (A.R. 8585) (Corps was "not aware of any changes to the project or new information that would call into question [USFWS'] determinations," but that it would agree to reinitiate consultation "in an abundance of caution … in light of concerns raised by certain members of the public in the notice of intent to sue dated January 9, 2020.").  Bolstering a litigation position is not a recognized reason to reinitiate consultation and manipulates the judicial process for reviewing agency action.

Moreover, after "reinitiating" consultation, USFWS did not do any of the things that would constitute consultation.  Even though two years had passed since its original BiOp, there is no evidence in the record that USFWS revisited its determinations, including by reviewing all relevant information, evaluating the baseline of affected species, evaluating the individual and cumulative effects of the action, adding these impacts to the baseline to determine whether jeopardy will occur, establishing reasonable and prudent alternatives, and creating an

incidental take statement if take will occur.  50 C.F.R. § 402.14(g)(1)–(7).  In fact,

there is no evidence that USFWS did anything substantive during this reinitiated

"consultation."  Nor could it have, since only four business days elapsed

between the supposed reinitiation of consultation and USFWS' Amended BiOp.

Rather, USFWS spent that time writing arguments into its BiOp intended

to boost its prior conclusions.  But "piling on more evidence" to justify a decision

USFWS had already made "is impermissible, whether termed an amendment or

not." Gifford Pinchot, 378 F.3d at 1077.  That USFWS' additions were more

argument than evidence makes its amendment all the more impermissible.

Notably, USFWS added argument to bolster its prior claim that it is too difficult

to estimate the increase in traffic, its resulting impact on panthers, and a take

limit for vehicular fatalities.  Am. BiOp at 6, 13–14 (A.R. 8639, 8606–07).

The only new data mentioned in the Amended BiOp and included in the

record is more information on the presence and concentration of panthers and

updated data specifying the number and cause of panther deaths.  Id. at 8 (A.R.

8601).  None of that information supports USFWS' flawed conclusions.  To the

contrary, the new information only further demonstrates that USFWS possesses

ample data to estimate the panther population and to measure take from vehicle

strikes.  Id. (detailing more radio-transmitted data on panther presence in the

action area and identifying an additional panther death resulting from a vehicle

strike in the action area).  In fact, the only substantive change between the BiOps

is that USFWS *reduced* the mitigation it required for the road expansion from 192

to 152 PHUs.  Id. at 9 (A.R.8602).  Thus, no evidence shows that USFWS actually

re-consulted on the project, considered any new information, undertook any new

analyses, or made any new determinations.

An agency cannot use post-hoc rationalizations to remedy inadequacies in

the agency's original decision, and an agency cannot support the decision it has

already made with additional explanation added after-the-fact and in response to

legal challenge.  See Chenery, 332 U.S. at 196.  An agency's decision, instead,

must "be upheld, if at all, on the same basis articulated in the order by the

agency itself."  Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–69

(1962); Friends of the Clearwater v. Dombeck, 222 F.3d 552, 560 (9th Cir. 2000);

Camp v. Pitts, 411 U.S. 138, 142–43 (1973) (agency cannot rely on post hoc

rationalizations to defend its earlier decisions); Nat'l Wildlife Fed'n, 235 F. Supp.

2d at 1152 ("An agency seeking to justify its action may not offer a new

explanation for the action, but must be judged on the rationale and record that

led to the decision."). To hold otherwise, allows an agency to manipulate judicial review of agency action. Gifford Pinchot, 378 F.3d at 1077.

### C. The Amended BiOp Also Fails to Create a Numerical Trigger for Panther Deaths from Vehicle Strikes.

Regardless of USFWS' attempt to bolster its action post hoc, the Amended BiOp suffers the same flaws as its predecessor because it too fails to create a numerical take limit for panther deaths resulting from vehicle strikes, even though it could. Instead, the Amended ITS simply attempts to explain away USFWS' failure to do so.

First, the Amended BiOp seeks to discount the quality of its own verified panther population estimates, the same numbers it has repeatedly relied on to make decisions about panther conservation efforts. Am. BiOp at 6–7 (A.R. 8599–8600); Determining the Size of the Florida Panther Population (2017) (A.R. 7958–59). For example, in the most recent Status of the Species Report, USFWS relied on the same verified panther population estimates to determine the viability of the current population. 2015 Status at 11 (A.R. 7247); 50 C.F.R. § 424.21 (five-year review requirement). And, as USFWS explained in the BiOp, the agency uses this very data to estimate the size and number of home ranges and travel

corridors that panthers use and to assess yearly breeding activity.  BiOp at 8

(A.R. 8280).

Second, in the Amended ITS, USFWS argued that it could not estimate

future panther deaths because it could not arrive at an exact projected estimate

for future traffic use on the SR 82 expansion.  Am. BiOp at 18 (A.R. 8611).

According to USFWS, because it could not precisely estimate future traffic

patterns, the agency could not make any estimate of future panther deaths from

vehicle strikes either.  Id.  USFWS then claimed that it was difficult to document

the adverse effects from the SR 82 road expansion.  Id.

These arguments conflict with reality.  As explained above, USFWS *has*

done this exact calculation before.  USFWS' belated claim that it had "no data"

about the amount, source, or timing of increases in traffic volumes expected from

the project flies in the face of the agency's duty to obtain that information—

which was readily available—before it makes decisions that will affect the

survival of the panther.  Id. at 19 (A.R. 8612).  And it ignores the fact that USFWS

had asked for this exact type of data previously.  Corkscrew BiOp, at 2 (Exhibit

13).  "FWS cannot escape its statutory and regulatory obligations by not

obtaining accurate scientific information." Sierra Club v. U.S. Dep't of the

Interior, 899 F.3d 260, 272 (4th Cir. 2018).

Despite USFWS' statements to the contrary, data *existed* showing projected

traffic patterns that would result from the SR 82 expansion, just as it does for any

FDOT project.  Indeed, Florida law requires FDOT to study, compile, and furnish

data and information as to all roads in the state.  Fla. Stat. § 334.24 (duty to

compile, maintain, and provide information relating to roads and road building

and repair); id. § 334.044(2) (FDOT must conduct research studies and collect

data necessary for the improvement of the state transportation system).

Pursuant to this duty, FDOT creates traffic studies projecting traffic volume, and

did so for SR 82.[12]  And USFWS has requested traffic impact reports previously.

See Corkscrew BiOp (Exhibit 13).  Therefore, data was available that showed

how traffic on the SR 82 segment would change due to expansion, and USFWS

cannot ignore it.

That projections based on this information may not be certain does not

relieve the agency of its obligations.  To the contrary, under the ESA "an agency

cannot abdicate its responsibility to evaluate the impacts of an action on a species

---

[12] For example, Plaintiffs motioned the Court to add extra-record evidence of a Traffic Study for SR 82 or, in the alternative, take judicial notice of the existence of such reports for the specific segment at issue.  (ECF No. 62.)  Plaintiffs have filed objections, ECF No. 89, to the Magistrate Judge's denial of those requests, ECF No. 87, which are pending before this Court.

by labeling available information 'uncertain,' because doing so violates Congress'

intent that agencies 'give the benefit of the doubt to the species.'" Miccosukee

Tribe I, 566 F.3d at 1267 (quoting Nat. Res. Def. Council v. Kempthorne, 506 F.

Supp. 2d 322, 360 (E.D. Cal. 2007)).

> **D.   USFWS Cannot Justify Its Use of a Habitat Surrogate to Extend Take Liability for Panther Deaths from Vehicle Strikes.**

Rather than provide a numerical take limit for panther deaths from vehicle

strikes, USFWS relied on an unjustified and unsupported habitat surrogate in

both BiOps.  A surrogate of "similarly affected species or habitat or ecological

conditions" may be used to express the amount or extent of anticipated take only

if USFWS makes specific showings.  50 C.F.R. § 402.14(i)(1)(i).  Here, the habitat

surrogate bears no connection to vehicle-related harm.  It involves only the

habitat area that the project plans to destroy through construction of the

expansion and nothing thereafter.  It has no relation to the operation of the

roadway or to vehicle strikes from operation of the roadway.

Moreover, a surrogate for numerical take is only permitted when USFWS

(1) explains why it is not practical to express the amount or extent of anticipated

take (or to monitor take-related impacts) in terms of individuals of the listed

species; (2) describes the causal link between the surrogate and take of the listed

species; and (3) sets a clear standard for determining when the level of anticipated take has been exceeded.  Id.; Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d 1101, 1126–27 (9th Cir. 2012) (agency must explain why it did not create a numerical cap on take); Allen, 476 F.3d at 1037–38 ("A surrogate number is valid only if 'no number may be practically obtained' and there is a verifiable level at which, if surpassed, would require reinitiating consultation."); Ariz. Cattle Growers', 273 F.3d at 1250 (same); Miccosukee Tribe II, 697 F. Supp. 2d at 1331 (agency must explain why no numerical value could be practically obtained and a reasonable nexus between the surrogate and take); Nat. Res. Def. Council v. Evans, 279 F. Supp. 2d 1129, 1184–85 (N.D. Cal. 2003); U.S. Fish & Wildlife Serv., ESA Section 7 Consultation Handbook 4–47 to 4–48 (1998), https://www.fws.gov/endangered/esa-library/pdf/esa_section7_ handbook.pdf (same) [hereinafter "ESA Section 7 Handbook"].  USFWS failed to justify its use of the habitat surrogate for the SR 82 expansion in the BiOps.

First, as explained in detail above, USFWS could have provided a numerical limit for take from vehicular strikes.

Second, USFWS failed to articulate any link between habitat loss and panther deaths from vehicular strikes.  To do so, USFWS was required to

demonstrate "a reasonable nexus" "between the ecological surrogate and the take." Miccosukee Tribe II, 697 F. Supp. 2d at 1331. Accord Ariz. Cattle Growers', 273 F.3d at 1250 (surrogate must "establish a link between the activity and the taking of species" and contain measurable guidelines sufficient to allow the applicant to determine when incidental take is exceeded and, accordingly, when to reinitiate consultation); Allen, 476 F.3d at 1038-39 (same); Oceana, Inc. v. Ross, No. CV 08-1881 (PLF), 2020 WL 5834838, at *5–8 (D.D.C. Oct. 1, 2020) (finding agency explanation of surrogate inadequate). In the ITS, however, USFWS did not even attempt to link the two. BiOp at 17 (A.R. 8289). Even the post-hoc Amended ITS failed to draw any connection between vehicular strikes and habitat loss. Am. BiOp at 18–19 (A.R. 8611–12). Instead, USFWS recognized that these impacts are separate and distinct, as it should. Habitat loss results from land clearing and construction activities and has a built-in take limit: whatever destruction happens from and during construction within the footprint of the project is the extent of the take from habitat loss. In contrast, harm from vehicle strikes results from ongoing activity on an expanded roadway following project completion. It has no temporal limitation. BiOp at 11–12 (A.R. 8283).

38

Finally, USFWS failed to provide meaningful guidelines sufficient to determine when incidental take from vehicular strikes is exceeded. At its core, a surrogate for numerical take "must be able to perform the functions of a numerical limitation." Allen, 476 F.3d at 1038. Indeed, without a meaningful trigger, an "ITS cannot be effective." Nat'l Wildlife Fed'n, 235 F. Supp. 2d at 1160. "Most importantly, the purpose of establishing a permissible take in an ITS is to ensure that *even if the project is implemented in strict accordance with the plan*, it will not result in a level of harm to the protected species that would cause the agency to reconsider its jeopardy determination." Id. (citing Arizona Cattle Growers', 273 F.3d at 1249) (emphasis added).

But the habitat loss surrogate here does not give any guideline, much less a meaningful one, for when vehicular strikes will have reached an unacceptable level. It would only kick in if FDOT failed to complete the project in accordance with its plan. And it provides no way to determine when the loss from vehicular takes is exceeded. Indeed, because the surrogate is time-limited (the habitat loss begins and ends with the construction period), it serves as no limit for vehicular strikes at all. Vehicular strikes come later when the roadway is in operation. USFWS' reliance on a habitat loss surrogate is unlawful and must be rejected.

Indeed, even USFWS' prior attempts to use a surrogate for take resulting *from* habitat loss that is coextensive with the project footprint itself has been rejected.  In <u>Allen</u>, USFWS tried to use a surrogate for takes of Northern spotted owls from habitat loss resulting from timber sales.  <u>476 F.3d at 1037–41</u>.  In that case, USFWS set a habitat surrogate that was coextensive with the acreage on which timber sales would be permitted.  <u>Id.</u>  Basically, as long as the project was completed as planned, the surrogate would not be exceeded.  The court rejected that approach, holding that using the scope of the project itself was not an appropriate trigger because there was no clear standard for when the authorized level of take had been exceeded.  <u>Id.</u>  Thus, even when the take results from habitat loss, USFWS is not permitted to set the take limit as the habitat that will be destroyed by the project.  That rationale is even more applicable here, where the take results from vehicle strikes that are of ongoing concern long after the loss of a particular area of habitat from construction activities.

Similarly, in <u>National Wildlife Federation</u>, the court found that plaintiffs were likely to succeed on their claim that an incidental take surrogate for take resulting from habitat destruction "in effect, amounts to the project's required work conditions" and was invalid.  <u>235 F. Supp. 2d at 1160</u>.  The court found that

allowing take that is coextensive with the project could not provide a meaningful trigger to reinitiate consultation, because it merely insured that the level of permitted take would not be exceeded if the project was completed as planned. Id. Again, here, the habitat surrogate only limits take if the project exceeds its planned footprint; it does nothing to limit ongoing take from vehicle strikes.

## II.   USFWS' BiOps Fail to Evaluate the Effects of the Action and the Cumulative Effects on the Panther.

In a biological opinion, the ESA requires USFWS to evaluate the "effects of the action," which are the direct and indirect effects of the proposed project on the species, together with the effects of interrelated actions, those that are "part of a larger action and depend on the larger action for their justification." 50 C.F.R. §§ 402.02, 402.14. USFWS must also evaluate cumulative effects on protected species, which are the "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." Id. §§ 402.02, 402.14. The biological opinion itself must contain the cumulative impact analysis. Id. § 402.14(g)(3). Finally, USFWS must "[a]dd the effects of the action and cumulative effects to the environmental baseline[,] and in light of the status of the species[,]" formulate its opinion as to whether the

action is likely to jeopardize the continued existence of listed species.  Id.

§ 402.14(g)(4).

Courts must set aside biological opinions as arbitrary and capricious when

an agency fails to consider the relevant factors or fails to make a rational

connection between the facts found and choices made.  See, e.g., Pacific Coast

Fed'n of Fisherman's Ass'n v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1034

(9th Cir. 2001); Fla. Key Deer, 364 F. Supp. 2d at 1345; Am. Rivers v. U.S. Army

Corps of Engineers, 271 F. Supp. 2d 230 (D.D.C. 2003); Greenpeace v. Nat'l

Marine Fisheries Serv., 80 F. Supp. 2d 1137, 1149 (W.D. Wash. 2000); Idaho Dep't

of Fish and Game v. Nat'l Marine Fisheries Serv., 850 F. Supp. 886, 900 (D. Or.

1994), vacated as moot, 56 F.3d 1071 (9th Cir. 1995).

The BiOp must be set aside as arbitrary and capricious because it

impermissibly failed to evaluate, and in some cases even identify, the effects of

the action and the cumulative effects of surrounding activities, thereby

precluding a reasoned basis for its no-jeopardy conclusion.  The issue USFWS

was tasked with evaluating was how many more fatalities, primarily those

caused by vehicular collisions, and acres of habitat loss and fragmentation can

the Florida panther endure and still survive, let alone recover from.  USFWS

invariably identified the primary threats to the panther as vehicular strikes and habitat loss and fragmentation, BiOp at 7 (A.R. 8279), but failed to undertake any meaningful analysis of the road project's effects as to these threats, combined with the cumulative effects of surrounding activities.[13]

Instead, USFWS focused narrowly, and inadequately, on habitat loss. USFWS only compared the physical loss of habitat from construction of this project to the panther's sizeable range when discussing effects of the project and cumulative effects. BiOp at 11, 15 (A.R. 8283, 8287) (comparing acreage lost from this project and likely annual acreage lost from future development to panthers' average home ranges, and calculating the percentage to be small). With road expansion projects already segmented so as to lead to piecemeal review,[14] USFWS' tunnel vision on acreage lost as a percentage of the panther's sizeable range unreasonably minimized the impact (direct, indirect, and cumulative) of this growth and development and predetermined the jeopardy analysis. This is particularly unreasonable given the severely endangered status of the panther even *with* its existing range. Failing to account for and evaluate all the effects

---

[13] While the Court dismissed Plaintiffs' challenges to the SR 29 biological opinion as moot on representations from FDOT that the project may not move forward, USFWS' action there contained the same dangerous pattern of legal flaws that must be set aside to ensure projects are not permitted to move forward without the protections guaranteed by Congress in the ESA.
[14] Exhibit 1 at 10-11 (Hollenhorst Dec. at ¶ 13).

means that each segment is treated as having de minimis impacts—leaving the panther to suffer death by a thousand cuts.

USFWS stated that habitat loss and fragmentation is the greatest threat to the panther's survival and recovery and admitted that this project, among many other development projects, will result in habitat loss and fragmentation.  BiOp at 7, 10-15 (A.R. 8279, 8282–87).  USFWS however dismissed the loss of over 20 acres of habitat and another 1,300 acres estimated to be lost each year as de minimis, given it amounts to such a small percentage of the panther's rather large home range.  Id. at 11-12, 15-16 (A.R. 8283–84, 8287–88).  This approach disregards the very definition of jeopardy, which requires a finding as to whether a project will *reduce* the species' chances of survival and recovery—not whether it will eliminate those chances.  50 C.F.R. § 402.02.  USFWS' approach also ignored one of the primary causes of the panther's decline: the panther is going extinct not because of any one project, but because of decades of projects fragmenting and destroying its habitat a sliver at a time.  Driven down to less than 5% of its natural range and now cornered in Southwest Florida, each remaining acre is even that much more essential for the panther's survival.  See 2015 Status at 6–7 (A.R. 7242–43).

The BiOp's cursory, three-paragraph cumulative effects discussion is also sorely lacking on its own terms.  Based on five general categories of state and county actions and undisclosed information provided by a consultant, USFWS found that roughly 1,301 acres would be developed per year.[15]  BiOp at 15 (A.R. 8287).  USFWS then dismissed the short-term impact of this annual acreage loss as insignificant based on the panthers' range yet concluded that the long-term impact of this loss may adversely affect the panther.  Id.  The "analysis" then abruptly ended, however, without ever evaluating the impact of this annual habitat loss on the panther's survival and recovery.

This exact approach was rejected in National Wildlife Federation v. Norton where USFWS attempted to justify a mine's habitat destruction by finding that it would be a small percentage of the panther's total habitat.  332 F. Supp. 2d 170, 177 (D.D.C. 2004).  The court found USFWS' failure to take the next step after calculating what percentage the acreage loss is compared to the panther's range to explain what the percentages meant for the panther was a "failure to make a 'rational connection between the facts found and the choice made.'"  Id.  For example, how would this short-term and long-term loss affect the quality and

---

[15] Failure to explain the full basis for this computation also renders this BiOp inadequate.  See Souza, 2009 WL 3667070, at *11-12 (finding cumulative impact analysis arbitrary due to agency's reliance on an unexplained fish density calculation).

quantity of the panther's habitat?  How would the increase in traffic caused by the development exacerbate panther road fatalities?  And how would the loss of habitat impact intraspecific aggression and potential for genetic disorders?

Similarly, in Greenpeace, the court overturned a biological opinion due to the agency's failure to properly consider the individual and cumulative effects of fishing practices on an endangered sea lion.  80 F. Supp. 2d at 1149.  The court criticized the agency's failure to "analyze and develop projections based on information that was available" and the agency's so-called analysis, which was "nothing more than a list."  Id. at 1149-50.

As in Greenpeace, the BiOps challenged in this case illustrate USFWS' repeated refusal to address the cumulative loss of habitat.  These narrow, short-sighted analyses are the antithesis of what a jeopardy analysis requires and, if allowed to continue, will leave the panther on the road to extinction.  See also Nat'l Wildlife Fed'n v. Coleman, 529 F.2d 359, 366, 373-75 (5th Cir. 1976) (invalidating biological opinion in part for failure to analyze "primary effects of the highway ... from the inherent development which accompanies a new highway" and focusing only on small acreage of habitat to be lost).

The ESA requires a cumulative effects analysis precisely to prevent an agency from viewing a single project in isolation, allowing it to easily dismiss any single project as inconsequential.  See, e.g., Norton, 332 F. Supp. 2d at 177-79 (cumulative effects analysis insufficient where USFWS failed to identify any specific projects reasonably certain to occur given the danger of habitat loss for the panther).  USFWS' cumulative effects analysis failed to satisfy the ESA because it also failed to identify and discuss any of the specific, known, and reasonably certain projects in the area, which is necessary for a meaningful analysis.  The agency unreasonably relied on a general, mathematical computation without discussing any specific projects.  With the rampant development underway in Collier County, like the adjacent road expansions along SR 82 and SR 29 and surrounding residential developments discussed above, the information necessary for this analysis is readily available.

Indeed, the effects of individual projects must be aggregated "to ensure that their cumulative effects are perceived and measured."  See Pac. Coast Fed'n of Fishermen's Ass'ns, 265 F.3d at 1035-37 (invalidating four biological opinions where agency disregarded "projects with a relatively small area of impact but that carried a high risk of degradation when multiplied by many projects and

continued over a long time period.")  To hold otherwise, would be "tantamount to assuming that no project will ever lead to jeopardy of a listed species."  Id. This myopic view begs the question of how it is that decades after the passage of the ESA, the Florida panther—one of the first species ever listed as endangered—finds itself on the brink of extinction.

A meaningful evaluation of cumulative effects is particularly important in this case considering that so much of panther habitat has been lost and is under ever-increasing threat due to intense development, road expansions, and attendant fatalities from vehicle strikes.  Indeed, as USFWS has acknowledged, "cumulative effects can be the deciding factor in determining the likelihood of jeopardy."  ESA Section 7 Handbook at 107.  Failure to properly address cumulative effects renders a biological opinion's conclusion arbitrary and capricious.  See Nat'l Wildlife Fed'n v. Coleman, 529 F.2d 359, 373-375 (5th Cir. 1976) (invalidating biological opinion in part for agency's failure to analyze a "principal" indirect effect from highway construction of inherent residential and commercial development that will accompany it); Fla. Key Deer, 364 F. Supp. 2d at 1357 (holding proposed reasonable and prudent alternatives were arbitrary

and capricious because they failed to consider the cumulative effect of permitted projects within the habitat of listed species).

Moreover, the loss of habitat is far from the only cumulative effect or threat to the Florida panther from a road expansion project.  Another glaring omission in the BiOp is USFWS' failure to analyze a leading cause of panther deaths—road fatalities.  2015 Status at 12 (A.R. 7248).  USFWS recognized that fatalities from vehicular strikes are a significant threat to the panther.  BiOp at 7 (A.R. 8279).  USFWS expected that panther usage/movement in this area—6,000 telemetry observations from 145 collared panthers, plus an unknown amount of presumably present uncollared panthers—would not change.  Id. at 8, 13 (A.R 8280, 8285).  USFWS admitted that panthers have a "habit of crossing busy roadways." Id. at 12 (A.R. 8284).  USFWS also admitted that traffic—one of the main justifications for this project—and the threat of vehicular strikes are expected to increase on this road.  Id. at 12-13 (A.R. 8284–85).  USFWS found that panthers are *likely* to be killed by vehicular collisions over the life of the project.

However, USFWS ultimately concluded, without support or explanation, that it expected panther road fatalities from the project, which includes operation of the expanded road, to be "small" in number.  Id. at 12, 16 (A.R. 8288).  USFWS

did not even quantify what it meant by "small."  Given that there are fewer than

120-250 adult panthers remaining in the wild, what USFWS means by a "small

number" is critical to evaluating any conclusion USFWS draws.  The BiOp

contained no evaluation of how this increased threat or the "small number" of

anticipated deaths will affect the panther's survival and recovery.

There was zero analysis of how these road fatalities would impact the

Florida panther's survival and recovery.  There was also zero analysis, or even

mention, of how this threat in combination with the cumulative effects from

known or anticipated traffic-inducing development will impact the panther's

survival.  These failures render the opinion arbitrary and capricious.  See Idaho

Rivers United v. Nat'l Marine Fisheries Serv., No. C94-1576R, 1995 WL 877502

(W.D. Wa. Nov. 9, 1995) (failure to analyze potential impact of hazardous spills

to listed salmons regardless of anticipated infrequency of its occurrence was

arbitrary and capricious); Sw. Ctr. For Biological Diversity v. Bartel, 470 F. Supp.

2d 1118, 1138-30 (S.D. Cal. 2006) (agency failed to consider important aspect of

the problem by authorizing take of vernal pool species outside certain wetlands

without evaluating impact of that take, despite its rarity, on survival of species as

a whole); Defs. of Wildlife v. U.S. Dep't of the Interior, 931 F.3d 339 (4th Cir.

2019) (vacating biological opinion in part for failure to evaluate how a threat to a mussel would impact both its survival *and* recovery—two distinct concepts).[16] With such low numbers remaining even a "small" number of deaths can be detrimental to their survival, let alone their recovery.

Any rationalizations contained in the post-hoc Amended BiOp are improper and should be rejected as argued above.  Even so, the Amended BiOp suffers from the same overarching legal flaws as its predecessor by failing to analyze how the estimated 1,300 acres of habitat loss per year and increases in traffic (5,000 new cars on the road per year) and vehicle mortality will impact panther survival and recovery.

Specifically, the Amended BiOp relies on the same estimated habitat loss per year (based on old data from 2012-2015), but again summarily concludes the impact will be "small" short-term and increase over time without any analysis of how a small and ever-increasing loss will impact the panther.  Am. BiOp at 15 (A.R. 8608).  The Amended BiOp also now claims the loss to be a "worst-case scenario" without support or explanation as to why.  Id.  USFWS then attempted

---

[16] See also, Fla. Key Deer, 364 F. Supp. 2d at 1356-85 (listing "secondary effects" from the biological opinion such as "increased traffic, illegal dumping, mortality from pets (especially cat predation), loss of fresh water (fertilizers degrading water quality), exotic fire ants, exotic vegetation, pesticide use and man-induced fires" as relevant to the cumulative effects analysis).

to punt the long-term effects analysis by stating it would continue to "monitor the effects" and "encourage" development of habitat conservation plans and incidental take permits—as if reliance on future acts and mitigation suffices.  Id. Although USFWS finally acknowledged increases in traffic and vehicular strikes, there is no analysis of how the 5,000 new cars per year that would "increase" vehicle mortality would affect panther survival and recovery.  Id. at 15-16 (A.R. 8608–09).

USFWS makes the conclusory assertion that the agency expected only a "small increase" in vehicle mortality in the short-term and an unidentified "increase" in the future.  Id.  USFWS failed to discuss how 5,000 new cars on the road per day would impact the number of car trips or how the Florida panther would be able to endure even a "small" increase in vehicle deaths.

III.   **USFWS' BiOps Fail to Analyze the Baseline Conditions.**

USFWS also impermissibly failed to analyze the baseline conditions for the panther, particularly the impact of Federal projects in the action area related to development, mining, and road projects.  During formal consultation, USFWS must "evaluate the current status and environmental baseline of the [impacted] listed species or critical habitat."  50 C.F.R. §§ 402.14(g), 402.02; Fla. Key Deer, 364 F. Supp. 2d at 1353.  As such, USFWS must evaluate "the past and present

impacts of all Federal, State, or private actions and other human activities in the

action area, the anticipated impacts of all proposed Federal projects in the action

area that have already undergone formal or early section 7 consultation, and the

impact of State or private actions which are contemporaneous with the

consultation in process."  50 C.F.R. § 402.02.

In the BiOp, USFWS made a general reference to federal actions "such

as: construction of highways and urban development" and "resource extraction,"

but nothing in the BiOp or record indicates that USFWS evaluated such projects

or their impacts.  BiOp at 9–10 (A.R. 8281–82).  Instead, USFWS vaguely said it

has consulted on 84 projects (without identifying what those projects are, what

the outcome of those consultations were, or what the anticipated or known

impacts of those projects will be) affecting approximately 41,868.6 acres of

panther habitat (without identifying where that habitat is or how the habitat has

been or is being affected).  Id.  USFWS provided no evaluation of the past and

present impacts of those actions, either individually or collectively.  And,

tellingly, the record includes a biological opinion for only one other project, a

2010 biological opinion on the Everglades Restoration, which USFWS cited solely

for its climate analysis.  Biological Opinion for Everglades Restoration Transition Plan, Phase 1, USFWS (2010) (A.R. 5722–5999); BiOp at 11, 21 (A.R. 8283, 8293).

One would have expected the record to contain information pertaining to the other projects USFWS asserts that it considered for its baseline assessment. But nothing in the record indicates what projects USFWS considered, even though there are a bevy of projects planned or ongoing in panther habitat areas. This information is readily available on public, government websites, and as such, the Court may take judicial notice of them.[17]  These include:

- The Troyer Mine project, which would cover over 1,800 acres, with 90% of the project located in the panther's primary zone habitat and would result in approximately 2,000 daily truck trips to and from the site.[18]

- The Rural Lands West project, which would impact almost 4,000 acres of habitat, with over 3,000 acres in primary zone habitat.[19]

- The Bellmar Development, which would cover about 1,500 acres within the panther's primary habitat, with 80% in adult breeding habitat.[20]

---

[17] See Fed. R. Evid. 201(b); Universal Express, Inc., 177 Fed. App'x at 53; R.S.B. Ventures, Inc., 514 Fed. App'x at 856, n.2.

[18] Letter from Amber Crooks, Conservancy of Sw Fla., to Larry Williams et. al, U.S. Fish & Wildlife Serv. (Feb. 2, 2020) (Exhibit 15), *accessible from* https://prodenv.dep.state.fl.us/Dep Nexus/public/electronic-documents/ST404_396364/gis-facility!search.

[19] Id.

[20] Id.

- FDOT plans to expand almost all of SR 82 and SR 29.[21]  Together, these expansions would cover over 80 miles of road in panther habitat areas.

These projects alone raise significant questions about the baseline condition for the Florida panther, something not captured by USFWS' description or purported analysis, which claimed, without any specificity, to have considered many projects involving much acreage.

Additionally, even if merely stating that the agency reviewed unidentified actions were sufficient for a baseline analysis—and it is not—USFWS' analysis still fell short of the ESA's requirements because it failed to *analyze* the impacts of these actions on the panther.  USFWS merely listed a number of unidentified projects with acres affected and the habitat preserved through mitigation, and then summarily concluded that "these Federal actions, individually and cumulatively, did not jeopardize the survival and recovery of the panther." BiOp at 10 (A.R. 8282).  USFWS articulated no analysis to reach that conclusion.

---

[21] Fla. Dep't of Transp., State Road (SR) 82 from Hendry County Line to Gator Slough Lane, Collier County Resurface/Add Lanes Financial Project No. 430848-1-52-01, http://www.swflroads.com/sr82/hendrytogatorslough (last visited Apr. 5, 2021) (Exhibit 16); Fla. Dep't of Transp., SR 82 Road Widening Project from Alabama Road to the Lee County/Hendry County Line, http://swflroads.com/sr82/leetohendry (last visited Apr. 5, 2021) (Exhibit 17); Fla. Dep't of Transp., SR 82 from Shawnee Road to Alabama Road - Design Project, http://sr82-shawneetoalabama.com (last visited Apr. 5, 2021) (Exhibit 18); Fla. Dep't of Transp., State Road 29: Capacity Projects (Jun. 2020) (Exhibit 19).

USFWS asked us, and now the Court, simply to take the agency at its word.  But the APA and ESA require more than that.

The hollowness of USFWS' statement is demonstrated by the failure to address the potential increased risk of vehicle strikes resulting from both development (e.g., more cars on the road) and expanded roadways (e.g., traffic increases, farther stretches for panthers to cross, increased speeds) associated with these unnamed 84 projects.  It is further demonstrated by the failure to identify the location of habitat affected by these unnamed 84 projects and any impacts on the connectivity between habitat areas.  As explained below, isolated habitat areas can increase the risk of intraspecies aggression and further exacerbate the limited genetic variation in panthers.  These are matters that a baseline assessment of the species would, at a minimum, be required to address and analyze to justify any conclusion the agency draws.

Here, as in National Wildlife Federation, "[w]hile the biological opinion does reference these other projects, ... there is no analysis of these projects or their impacts."  No. 08-14115-CIV, 2009 WL 3667070, at *6 (S.D. Fla. Oct. 23, 2009) (USFWS violated the APA by only referencing specific federal projects but failing to analyze the projects or their impacts) (internal citation omitted).  Here, USFWS

did not even identify any of the projects it claimed to have considered.  It therefore could not, and indeed did not, analyze the impacts of those projects.  This is not sufficient to satisfy the ESA's requirements.

This case is readily distinguishable from Miccosukee Tribe I, 566 F.3d at 1268–69.  There, the court found that the BiOp was not required to "thoroughly discuss state actions" that USFWS had previously determined had "no impacts" on the species, particularly since none of the projects identified by plaintiffs would adversely impact the species at issue.  Id. at 1269.  Here, by contrast, the road, development, and mining projects discussed above, individually and cumulatively pose threats to panthers.  Notably, in the BiOp, USFWS did not claim that the prior 84 actions had "no impact" on the species.  USFWS was therefore required to discuss those actions.

The same hollow analysis persists in the Amended BiOp.  The post-hoc Amended BiOp should be rejected as improper, but even if considered, it appears that USFWS made only minimal changes to the baseline analysis directed at removing details relevant to consultation regarding another species.  Compare BiOp at 9–10 (A.R. 8281–82) with Am. BiOp at 9–10 (A.R. 8602–03).  For example, the number of projects and affected acreage is the same in both BiOps,

even though the latter issued two years later.  Compare BiOp at 9–10 (A.R. 8281–82) with Am. BiOp at 9–10 (A.R. 8602–03).

USFWS' failure to assess the baseline conditions as required by law, and its failure to assess the individual and cumulative impacts of the project, were arbitrary and capricious.  The agency's conclusions must therefore be set aside.  5 U.S.C. § 706(2)(A).

### IV. The Corps' Actions Must Be Set Aside Because It Unlawfully Relied on the Flawed SR 82 BiOps when Issuing its NEPA Analysis and the CWA Permit.

The Corps, for its part, violated the ESA and the CWA by arbitrarily relying on the flawed BiOp when issuing its EA for the SR 82 expansion and accompanying CWA Section 404 permit.  The ESA and CWA regulations both require the Corps to ensure that a 404 permit not jeopardize the survival and recovery of protected species.  16 U.S.C. § 1536(a)(2); 33 U.S.C. § 1344(b)(1); 40 C.F.R. § 230.10(b)(3).  An agency cannot rely on a "facially flawed BiOp" or "blindly adopt" the faulty conclusions of USFWS.  Am. Rivers v. Fed. Energy Regul. Comm'n, 895 F.3d 32, 55 (D.C. Cir. 2018); Nat'l Wildlife Fed'n v. Norton, 332 F. Supp. 2d 170, 182 (D.D.C. 2004).  The Corps cannot "abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a[n] [US]FWS biological opinion must not have been arbitrary

or capricious."  See Fla. Key Deer v. Paulison, 522 F.3d 1133, 1145 (11th Cir. 2008)

(reliance on an invalid biological opinion "is likewise arbitrary and capricious

and may be challenged").

Here, the Corps failed to assess the impacts of its actions, because it relied

entirely on the flawed USFWS' BiOps.  EA at 19, 37–39, 46 (CORPS A.R. 4622,

4640–42, 4649); Supplemental EA, at 1–4 (CORPS A.R. 7243–46) ; 404 Permit at 6

(CORPS A.R. 5349); 404 Permit Modification at 1–2 (CORPS A.R. 7180–81)

(modifying the permit relying on and incorporating the Amended BiOp).  As

shown above, USFWS' BiOps were unlawful, and it was therefore unreasonable

for the Corps to rely on them.

## V.    The Corps Failed to Analyze Cumulative Impacts.

NEPA requires the Corps to analyze the cumulative impacts of its actions

on the environment.  40 C.F.R. § 1508.7; Souza, 2009 WL 3667070, at *26; Grand

Canyon Trust v. FAA, 290 F.3d 339, 341–43 (D.C. Cir. 2002).[22]  The EA, however,

includes no discussion of the cumulative impacts on Florida panthers from the

SR 82 expansion along with foreseeable future actions.  EA at 34–37 (CORPS EA

4637–40).  In fact, the EA's cumulative impacts section fails to mention the

panther at all.  Id.  The Corps included no discussion of the many ongoing,

---

[22] Plaintiffs cite the regulations and guidance that were in place at the time of the agency's
action (2018).  40 C.F.R. § 1506.13 (2020).

planned, and projected developments and road projects set to occur in Southwest
Florida, but instead vaguely referred to "development." Id.  And the Corps
explicitly refused to evaluate the cumulative impacts of future developments in
this region, claiming it would instead evaluate those projects individually when
they occur. Id. at 36.  The Supplemental EA is consistent in this regard.
Supplemental EA at 1–4 (CORPS EA 7243–46).  These "perfunctory references do
not constitute analysis useful to a decisionmaker in deciding whether, or how, to
alter the program to lessen cumulative environmental impacts." Nat. Res. Def.
Council, Inc. v. Hodel, 865 F.2d 288, 299 (D.C. Cir. 1988). See Souza, 2009 WL
3667070, at *26 (rejecting EA when the Corps failed to "even mention" "the
combined impacts of development" and the project's wetlands loss).  As such,
the EAs should be set aside. Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,
401 F. Supp. 2d 1298, 1326 (S.D. Fla. 2005).

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request this Court
grant summary judgment in their favor and against USFWS as to Counts Two,
Six, and Eight, for violations of the ESA, 16 U.S.C. §§ 1531–1544, and in their
favor and against the Corps as to Counts Four, Five, and Seven, for violations of
NEPA, 42 U.S.C. §§ 4321–4370h, of the Second Amended Complaint.

Respectfully submitted this 25th day of October 2021.

*/s/ Bonnie Malloy*
BONNIE MALLOY
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

TANIA GALLONI
Fla. Bar No. 619221
CHRISTINA I. REICHERT
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

*Counsel for Plaintiffs*

61

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this the 25th day of October 2021, I electronically

filed the foregoing with the Clerk of Court using the CM/ECF system, which will

send notification of the filing to all counsel of record.

<u>*/s/ Bonnie Malloy*</u>
BONNIE MALLOY