UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SIERRA CLUB and
ENVIRONMENTAL
CONFEDERATION OF
SOUTHWEST FLORIDA,

    Plaintiffs,

v.                                      Case No.: 2:20-cv-13-SPC-NPM

U.S. FISH AND WILDLIFE
SERVICE, AURELIA
SKIPWORTH, FLORIDA
DEPARTMENT OF
TRANSPORTATION, KEVIN J.
THIBAULT, U.S. ARMY CORP OF
ENGINEERS and TODD T.
SEMONITE,

    Defendants.
_____/

## OPINION AND ORDER

Before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 121), Request for Oral Argument (Doc. 122), and Motion for Judicial Notice (Doc. 137), and Defendants' Motion for Summary Judgment (Doc. 130). For the reasons below, the Court grants Defendants' Motion for Summary Judgment.

This case involves the expansion of a three-mile stretch of State Road 82. The Florida Department of Transportation (FDOT) applied for a Clean Water

Act dredge and fill permit for the project. Because the project crosses through Florida panther habitat, the Army Corps of Engineers (the Corps) consulted the United States Fish and Wildlife Service (the Service). The Service issued a biological opinion finding the project unlikely to jeopardize the continued existence of the Florida panther. The Corps then issued its environmental assessment and a permit authorizing the project.

Plaintiffs sued alleging violations of the Endangered Species Act (ESA), the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA). (Doc. 1). A few months later, the Service reinitiated consultation and amended its biological opinion. The Corps then supplemented its environmental assessment and modified the permit. In turn, Plaintiffs amended their complaint. (Doc. 65). FDOT has since finished the project. To date, the Court has resolved various issues about extra-record materials and mootness. The parties now ask the Court to review the Service and the Corps' actions via cross motions for summary judgment.

The ESA requires the Corps and the Service to consult each other and make sure their actions are not likely to jeopardize the continued existence of the Florida panther. *See* 16 U.S.C. § 1536(a)(2). If an action may adversely affect the Florida panther, then the Service issues a biological opinion. In this opinion, the Service reviews all relevant information, evaluates the environmental baseline, evaluates the effects of the action and cumulative

2

effects, and ultimately adds the effects of the action and the cumulative effects to the environmental baseline to determine whether the action would jeopardize the Florida panther. *See* 50 C.F.R. § 402.14(h). If the action would not jeopardize the Florida panther but would nonetheless cause incidental harm, the Service includes in its biological opinion an incidental take statement. This statement provides, among other things, the amount of anticipated take resulting from the action. If the take ultimately exceeds the amount specified by the Service, it must reinitiate consultation. *See* 50 C.F.R. § 402.14(i).

The NEPA requires federal agencies to assess the environmental effects of proposed federal actions. *See* 42 U.S.C. § 4332. If an action "is not likely to have significant effects" or "the significance of the effects is unknown," an agency generally must prepare an environmental assessment. *See* 40 C.F.R. § 1501.5(a). The agency must "[b]riefly discuss the purpose and need of the proposed action, alternatives . . . and the environmental impacts of the proposed action and alternatives[.]" 40 C.F.R. § 1501.5(c)(2). The environmental assessment helps the agency determine whether to issue an environmental impact statement or a finding of no significant impact. 40 C.F.R. § 1501.5(c)(1).

The Court reviews agency decisions governed by these statutes under the APA's highly deferential arbitrary and capricious standard. *See* 5 U.S.C.

3

§ 706; *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002). Under this standard, the Court will not substitute its own judgment for that of the agency, but it must "ensure that the agency took a 'hard look' at the environmental consequences of the proposed action.'" *Lowman v. Fed. Aviation Admin.*, No. 21-14476, 2023 WL 6632725, at *5 (11th Cir. Oct. 12, 2023) (citation omitted). The Court will overturn an agency's decision only if:

> (1) the decision does not rely on factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

*Id.* Because this is a deferential standard, an agency's compliance with the ESA and NEPA need not be perfect. *Id.*

Before reaching the merits, the Court must determine which agency action is under review—the original biological opinion or the amended one? Plaintiffs ask the Court to review the original biological opinion, arguing the amended biological opinion is a "transparent attempt to inject post-hoc rationalizations . . . through a sham reinitiation of consultation[.]" (Doc. 121 at 28). The Court disagrees.

First, the record does not support Plaintiffs' claim that the Service's reinitiation of consultation was a sham intended to manipulate the Court's

review. The Service reinitiated consultation after advising both Plaintiffs and the Court of its plans. (*See* Doc. 27 at 7 ("Federal Defendants have advised the other parties that they anticipate reinitiating Endangered Species Act ('ESA') consultation concerning the project[.]")). Reinitiating consultation in response to a lawsuit seems to be common practice. *See, e.g., Sierra Club*, 295 F.3d at 1218 ("In response to the suit, the Corps initiated a third consultation with FWS in order to confirm the earlier determination that the project would not affect those four species."); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 540 (11th Cir. 1996) ("In response to the suit, the F.W.S. requested that the Corps resume § 7 consultation on the permit.").

Second, reviewing only the original biological opinion would be futile. Over two and a half years ago, Plaintiffs sought to amend their complaint to challenge the actions related to the amended biological opinion. (Docs. 63, 65). The Court allowed amendment in part because of Plaintiffs' representations that adding the claims "would serve the interests of justice by ensuring that Plaintiffs are permitted to fully litigate the Federal Defendants' actions regarding SR 82" and "would also allow for all issues to be resolved at summary judgment and avoid potential piecemeal litigation[.]" (Doc. 63 at 8). The parties have now fully litigated the amended biological opinion.

And third, Plaintiffs' authorities do not require the Court to ignore the amended biological opinion. Plaintiffs cite 50 C.F.R. § 402.16(a) for the

5

proposition that reinitiation of consultation is appropriate only when (1) take limits are exceeded, (2) new information reveals effects not previously considered, (3) the action is modified in a manner that causes an effect not previously considered, or (4) a new species is listed that may be affected. But this regulation seems to *require* reinitiation under those circumstances, not *limit* reinitiation to those circumstances. In any event, the Service considered new information (updated and corrected data regarding the Florida panther) during its reinitiation.

Plaintiffs also cite 50 C.F.R. § 402.14 to argue that during the second consultation the Service did not review again all relevant information, evaluate the baseline, evaluate cumulative effects, come to a jeopardy decision, establish reasonable and prudent alternatives, and create an incidental take statement. Not so. The amended biological opinion shows that the Service did just that.

Plaintiffs caselaw does not narrow the Court's review either. Unlike in *Gifford Pinchot* and company, here the Service did not merely "pile[] on more evidence" to support its original biological opinion. 378 F.3d 1059, 1077 (9th Cir.), *amended*, 387 F.3d 968 (9th Cir. 2004). The Service coordinated with the Corps to reinitiate consultation. And once the Corps agreed, the Service reviewed the relevant data anew. The Court knows this because it is apparent on the face of the amended biological opinion. The Service corrected its data

6

regarding the number of Florida panthers alive or unknown and the number of injuries and deaths resulting from vehicle collisions in the action area. (FWS 8601-02).[1] The Service also discusses a vehicle collision that occurred on May 11, 2020, about 21 miles from the project footprint. (FWS 8601). This collision occurred nearly two years after the original June 29, 2018, biological opinion. (FWS 8273-91). And the amended biological opinion includes FDOT's proposal to provide 152 Panther Habitat Units to compensate for the loss of habitat resulting from the project. This proposal is based on changes to the Service's Habitat Assessment Methodology that occurred after the Service issued its original biological opinion. (FWS 8597).

The Service's use of corrected data, the 2020 vehicle collision, and the changes to the Service's method show that the Service's amendment did not merely explain its earlier actions. These new data points could not have explained the earlier decision. Rather, they supported a new agency action—the amended biological opinion. And in response to the Service's amendment, the Corps supplemented its environmental assessment and modified the dredge and fill permit. This new agency action is properly before the Court. *See Biden v. Texas*, 142 S. Ct. 2528, 2544 (2022) (holding if an agency complies

---

[1] The Court cites the Service and Corps' administrative record as "FWS" and "CORPS," respectively, with the appropriate page number.

7

with the procedural requirements for new agency action, then that new action generally is not subject to the charge of post-hoc rationalization).

At bottom, Plaintiffs' issue with the amended biological opinion is that it came to the same conclusion as the original. (*See* Doc. 121 at 28 ("Rather than correct this legal error after Plaintiffs sued, USFWS issued an Amended BiOp that again failed to set a numerical take limit for vehicle fatalities and instead unlawfully relied on a habitat surrogate that has no connection to vehicle strikes."). But the fact that the Service came to the same conclusion the second time around does not invalidate the amended biological opinion. *See Biden v. Texas*, 142 S. Ct. at 2547 ("It is black-letter law that an agency that takes superseding action on remand is entitled to reexamine the problem, recast its rationale and reach the same result.") (cleaned up).

The Court is not persuaded by Plaintiffs' arguments. So the Court will consider the amended biological opinion to resolve all issues and avoid needless piecemeal litigation and delay.

With the amended biological opinion properly before the Court, we turn to whether it is arbitrary, capricious, or otherwise not in accordance with the ESA and relevant regulations. Plaintiffs assert that the Service failed to evaluate the environmental baseline of the Florida panther, evaluate the effects of the action and cumulative effects, and set a numerical take limit.

8

(Doc. 121 at 5). As for the Corps, Plaintiffs argue it erred by relying on the Service's allegedly flawed opinion. (*Id.* at 57-59).

The Court starts with the baseline. During formal consultation, the Service must "[e]valuate the current status and environmental baseline of the listed species or critical habitat." 50 C.F.R. §§ 402.14(g)(2). The baseline includes, among other things, "the condition of the species" and the "past and present impacts of all Federal, State, or private actions and other human activities in the action area[.]" 50 C.F.R. § 402.02.

The Service spent several pages of its amended biological opinion thoroughly evaluating the environmental baseline of the Florida panther. It started by outlining the status of the Florida panther in the action area. On this score, the Service described its radio telemetry data on Florida panther activity. The Service noted conflicting studies on whether that data "may present an incomplete picture" as Florida panthers "typically rest in dense cover during daytime monitoring flights[.]" (FWS 8600). The Service also explained that "[o]nly a subset of the panther population has been radio collared." (*Id.*). With these caveats, the Service determined that "up to 32 radio-collared panthers may currently occur in the action area." (FWS 8601). And the Service described the effects of vehicle collisions and intraspecific aggression on Florida panthers in the action area. (FWS 8601-02).

9

Next, the Service described the factors affecting the Florida panther's environment within the action area. On this score, the Service acknowledged human activities such as "construction of highways and urban development, agriculture operations, resource extraction, public lands management (prescribed fire, public use, exotic eradication, etc.), hydrological restoration projects, and public and private land protection efforts." (FWS 8602). The Service explained that since 1982, the Service has consulted on 84 projects affecting about 41,868.6 acres of Florida panther habitat and that "these Federal actions, individually and cumulatively, did not jeopardize the survival and recovery of the panther." (FWS 8603). Along with these projects, 31,160 acres of habitat was restored or preserved. (*Id*.). The Service also observed that "[m]uch of the land adjacent to the Project site is currently managed for agricultural purposes (e.g., pasture for cattle ranching, citrus groves, row crops, etc.)." (*Id*.). To conclude its baseline discussion, the Service described the potential effects of climate change on the Florida panther. (FWS 8603-04).

Plaintiffs claim the Service's baseline discussion is inadequate because the Service did not specifically identify or discuss each of the 84 projects. But the Service need not thoroughly discuss "actions that the Service in other consultations has already analyzed and determined do not impact the species." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1268 (11th Cir. 2009) (holding the Service's environmental baseline discussion was

sufficient even though it did not mention two current state projects or include the Service's conclusions about those projects in the record). And, taken as a whole, the Service's thorough discussion shows it evaluated the environmental baseline of the Florida panther, including both the status of the Florida panther and the human activities affecting the Florida panther in the action area.

Next, Plaintiffs argue the Service failed to "[e]valuate the effects of the action and cumulative effects" on the Florida panther. 50 C.F.R. §§ 402.14(g)(3). The effects of the action include all consequences to the Florida panther caused by the action, including consequences of other activities that are reasonably certain to occur. *See* 50 C.F.R. § 402.02. Cumulative effects refers to the effects of future non-federal activities that are reasonably certain to occur. *Id*. The Service must add these effects to the environmental baseline to determine (in light of the status of the Florida panther) whether the action is likely to jeopardize its continued existence. 50 C.F.R. § 402.14(g)(3)-(4).

For the effects of the action, the Service discussed how the loss of 23.13 acres may adversely affect the panther and its prey, including the risk of intraspecific aggression. (FWS 8605). Because the 23.13 acres represents only a small portion of Florida panther habitat, the Service found these risks are small. The Service observed that 23.13 acres is only .002 percent of the 1,962,294 acres of non-urban private lands available to the Florida panther at

11

risk of development. (FWS 8604). And it observed that 23.13 acres amounts to only .08 percent of a female panther's territory and .04 percent of a male panther's territory. (FWS 8605.). So, the Service found that the habitat loss would affect no more than one female and one male panther. (*Id.*).

Discussing construction activities, the Service acknowledged that construction equipment could disturb or harm Florida panthers. But the Service found that panthers would likely avoid that equipment given their intelligence, their activity patterns, and the equipment's slow rate of speed. (*Id.*).

The Service also evaluated the effects of operating SR 82. It acknowledged that widening the road means that Florida panthers will take longer to cross and will encounter more vehicles. (*Id.*). But the Service ultimately found that the risk of Florida panther deaths is small because (1) only one panther was struck and killed by a vehicle between 1979 and 2020 on this stretch of SR 82, (2) panther crossings are not likely to increase because the adjacent panther territories are occupied and new panthers in the area are unlikely, and (3) the widening is relatively minor (widening three miles of road by 24 feet). (FWS 8606).

For the cumulative effects, the Service analyzed past and ongoing non-federal actions to project future development. These actions include "(1) State of Florida Development of Regional Impact (DRI) Orders; (2) County

12

Comprehensive Plan Amendments; (3) County Zoning Amendments; (4) County Planned Unit Developments (PUDs); and (5) South Florida Water Management District's Environmental Resource Permits (ERPs)." (FWS 8607). The Service incorporated Florida Land Use Cover and Forms Classification System mapping to determine which actions are exempt from federal review. (*Id.*). Using this data and the help of FDOT's consultant, it found that from 2012 through 2015, 26 projects in the area affecting 3,903 acres were exempt from federal review. (FWS 8608). From there, the Service estimated that about 1,301 acres per year (3,903 divided by 3 years) would be exempt in the future. (*Id.*). It acknowledged that forecasting development can be difficult but found this estimate was "the best approximation available[.]" (*Id.*)

The Service noted that the estimated 1,301 acres per year represents only .066 percent of the non-urban private lands available to the Florida panther at risk of development. (*Id.*). It also noted that the 1,301 acres equates to 4.5 percent of a female panther's territory and 2.1 percent of a male panther's territory. (*Id.*). The Service did not stop there but observed this would be the "worst-case scenario" and explained that it expects development will be spread over multiple Florida panther territories. (*Id.*). It also analyzed the expected increase in traffic resulting from the 1,301 acres developed each year. The Service found that "assum[ing] the 1,301 ac developed per year

13

consists of 0.5 ac lots with 2 vehicles per lot" the development would likely lead to 5,204 more vehicles on the road each year. (*Id*). It expects this increase in traffic to cause a "small increase in panther vehicle mortality in the short-term" that would increase over the long-term. (FWS 8609). And the Service stated that it expects this small risk to be spread out over the action area, rather than concentrated, because development and increased traffic will be spread out as well. (*Id*.).

Plaintiffs argue the Service failed to (1) explain its estimate that 1,301 acres of Florida panther habitat will be developed each year and (2) analyze how that lost acreage and increased traffic will impact the Florida panther. (Doc. 121 at 56). But the Service sufficiently explained the 1,301-acre estimate, the accompanying traffic, and how the habitat loss and traffic may affect the Florida panther. It explained the basis of the 1,301-acre estimate—calculating that figure by looking to non-federal actions from 2012 through 2015 and "project[ing] this level of development as representative of future non-Federal actions." (FWS 8607). Further, the Service analyzed how the 1,301 developed acres and accompanying traffic may affect the Florida panther, considering the Florida panthers' territory, available lands, and more vehicles traveling on SR 82. In short, the Service evaluated the effects of future non-federal activities that are reasonably certain to occur.

14

Plaintiffs' remaining challenge to the amended biological opinion involves the incidental take statement. The Service determined that "[i]ncidental take in the form of direct mortality of panthers is expected to result from increased collisions with motor vehicles using the widened roadway." (FWS 8611). But rather than set a numerical take limit, the Service used a habitat surrogate to monitor incidental take. (FWS 8611-12). Plaintiffs argue this violated the ESA. In relation to this challenge, Plaintiffs ask the Court to take judicial notice of the Corkscrew biological opinion. The Court takes judicial notice of the Corkscrew biological opinion but otherwise disagrees with Plaintiffs.

The Service may use a habitat surrogate if it explains why setting numerical take is not practical, describes the causal link between the surrogate and take, and sets a clear standard for determining when anticipated take has been exceeded. *See* 50 C.F.R. § 402.14(i)(1)(i). Here, the Service determined that it "is not able to project the future amount of panther mortality resulting from collisions with motor vehicles" but "expect[s] the number to be small." (FWS 8611). It explained that setting numerical take is not practicable because "(1) the panther is wide-ranging and it is difficult to monitor panthers in their territories; especially un-collared panthers; [and] (2) it is difficult to document the adverse effects of habitat loss from the Project on survival and reproduction of an individual panther." (FWS 8611).

15

This finding follows the Service's discussion of Florida panther data throughout its amended biological opinion. During its status-of-the-species discussion, the Service described how the Florida panther is a "wide-ranging species." (FWS 8599). And during its baseline discussion, the Service noted that its telemetry data "may present an incomplete picture." (FWS 8600). Additionally, it noted that only a subset of panthers is radio collared and that panthers cannot be individually identified by sightings. (FWS 8600-01).

So the Service used habitat loss as a surrogate for incidental take and set the amount of incidental take at 23.13 acres of Florida panther habitat. It found that "habitat loss is easily measured and monitored" (FWS 8611) and that the habitat surrogate sufficiently encompasses the risk of vehicle collisions because:

> (1) the amount of actual habitat loss is a small amount of a panther's home range and our estimate of incidental take rounds the take up to one male and one female; (2) the history of vehicle strikes in the Project footprint have been consistently low over time; (3) we do not expect the number of panthers in the area to increase due to the territorial behavior of panthers.

(FWS 8612). Finally, the Service stated that "should impacts from the proposed Project increase beyond the loss of 23.13 ac (9.36 ha) of panther habitat . . . any operations causing such take must cease pending reinitiation." (FWS 8613).

Notwithstanding Plaintiffs' arguments, nothing more was required. Several courts have upheld the Service's use of a habitat surrogate for the Florida panther under similar circumstances. *See, e.g.*, *Conservancy of Sw. Fla., Inc. v. Williams*, No. 13-14477-CIV, 2018 WL 11422990, at *18 (S.D. Fla. Dec. 21, 2018) (reasoning "only a subset of the [Florida panther] population is radio-collared at any time" and "it is not feasible to count the exact number of panthers responsible for creating . . . physical evidence because panthers are wide ranging and secretive."). This includes a case from the Fort Myers Division in which this Court upheld the Service's use of a habitat surrogate and the Eleventh Circuit affirmed. *See Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 46 F. Supp. 3d 1254, 1336 (M.D. Fla. 2014), *adhered to on reconsideration*, No. 2:11-CV-578-FTM-29CM, 2015 WL 476163 (M.D. Fla. Feb. 5, 2015), *aff'd sub nom. Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, 835 F.3d 1377 (11th Cir. 2016).

Plaintiffs try to distinguish these cases as involving harassment to the Florida panther, rather than vehicle strikes. They argue that monitoring lethal take is easier than monitoring harassment. Regardless of the merits of this argument, the relevant regulations state that the Service may use a habitat surrogate if it is not practical "to express the amount or extent of anticipated take ***or*** to monitor take-related impacts in terms of individuals of the listed species[.]" 50 C.F.R. § 402.14(i)(1)(i) (emphasis added). Although the

17

impracticality of monitoring take is one basis to use a habitat surrogate, the Service may also use a habitat surrogate if (as here) expressing the amount of take as an initial matter is not practical, irrespective of the practicality of monitoring that take going forward.

Finally, Plaintiffs ask the Court to take judicial notice of the Corkscrew biological opinion to show that the Service can set a numerical take limit for the Florida panther by utilizing certain traffic data. (Doc. 137). The Court takes judicial notice of the Corkscrew biological opinion as it is relevant to rebut Defendants' argument that it was impossible for the Service to meaningfully estimate the increased risk of Florida panthers regarding vehicle strikes. In that biological opinion, the Service considered traffic data in its effects-of-the-action analysis and estimated there would be no take of Florida panthers from project-generated traffic. (Doc. 92-19 at 15). To account for harm due to habitat loss and harassment, however, the Service used a habitat surrogate in its incidental take statement. (Doc. 92-19 at 17). At best, the Corkscrew biological opinion shows that for some projects the Service can calculate estimated take, and for others it cannot. And Plaintiffs' heavy reliance on the Corkscrew biological opinion is curious given its use of a habitat surrogate (as well as other parallels with the amended biological opinion at issue here).

Moreover, the Corkscrew biological opinion's use of certain traffic data does not undermine the Service's analysis here. Plaintiffs point to a 2009 project development and environment study to show that the Service should have used similar available data. (CORPS 286-754). But the Court is satisfied that the Service sufficiently evaluated the effects of increased traffic without considering this old study discussing the prospect of widening SR 82 to six lanes. Afterall, under the APA, the Court must exercise "substantial deference" to the Service's decision on "how much data is necessary to fully address each issue." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008).

Here, the Service sufficiently explained that setting numerical take was impractical, the causal link between the habitat surrogate and take (as the Service put it, why the surrogate "sufficiently encompasses" the risk of vehicle strikes), and how the surrogate is easily monitored for reinitiation of consultation. The Service's incidental take statement was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA and relevant regulations.

Finally, Plaintiffs argue the Corps violated the ESA and NEPA by relying on the Service's "facially flawed" biological opinion. (Docs. 65 ¶ ¶ 101-113; 121 at 57-59). But the Court has determined the Service's amended biological opinion is not facially flawed. Plaintiff's claims against the Corps fail.

Accordingly, it is now

**ORDERED:**

1. Plaintiffs' Unopposed Motion for Judicial Notice (Doc. 137) is **GRANTED**.

2. Plaintiffs' Request for Oral Argument (Doc. 122) is **DENIED**.

3. Plaintiffs' Motion for Summary Judgment (Doc. 121) is **DENIED**.

4. Defendants' Motion for Summary Judgment (Doc. 130) is **GRANTED**.

5. The Clerk is **DIRECTED** to enter judgment for Defendants and against Plaintiffs, deny any pending motions as moot, terminate any deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on November 1, 2023.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record